Eugene R. WALL and Judith B. Wall, Plaintiffs and Respondents,

v.

Al ZEEB and the State Bonding Fund, Defendants and Appellants.

No. 8388.

Supreme Court of North Dakota.

Oct. 26, 1967.

Rehearing Denied Nov. 17, 1967.

Rausch & Chapman, Bismarck, for appellant Al Zeeb.

Helgi Johanneson, Atty. Gen., and Gerald VandeWalle, Asst. Atty. Gen., Bismarck, for appellant The State Bonding Fund.

Zuger, Zuger & Bucklin, Bismarck, for plaintiffs and respondents.

TEIGEN, Chief Justice.

The plaintiffs, husband and wife, by this action seek to recover compensatory and exemplary damages for alleged assault and battery upon the plaintiff Eugene R. Wall by the defendant Al Zeeb, a police officer. After a verdict and judgment for the plaintiffs, the defendant Al Zeeb moved for a new trial on the grounds which fall into two major groups—errors of law occurring at the trial and excessive damages appearing to have been given under the influence of passion and prejudice. The trial court denied the motion for a new trial, whereupon the defendants Zeeb and the State Bonding Fund appealed from the order denying the motion for new trial.

The complaint alleges that at about 1:00 a. m. on April 19, 1964, at Wilton, North Dakota, the plaintiff Eugene R. Wall was sleeping on property owned by his mother. The defendant Al Zeeb, as the chief of police of the city of Wilton, entered on the property and struck, beat, and battered Wall while he was sleeping, using fists, weapons, and deadly force likely to cause serious injury or death. The defendant Al Zeeb placed a firearm containing a tear gas shell against the face and eyes of the plaintiff Wall and exploded a tear gas shell directly into Wall's face and eyes. Plaintiff alleges that the acts of Al Zeeb caused him to permanently lose sight of both of his eyes and that he suffered bruises, open wounds, burns and other injuries to his face, head, and upper body. The complaint alleges that if the defendant Al Zeeb attempted to make a lawful arrest, it was made by using more force than was reasonably necessary and subjected the person arrested to unnecessary risk of serious harm.

Plaintiff alleges that the defendant Al Zeeb knew that he had been declared by many psychiatrists and medical doctors as being a person of unusal aggressive and dangerous tendencies who could not be trusted with a dangerous weapon, and that he had been relieved of duties during his military service, treated in government hospitals, and given a discharge for mental instability, making him unfit for military service involving the carrying of a weapon. It is alleged that the defendant had been discharged from his duties as a police officer for the city of Bismarck, North Dakota, for the reason of unfitness and mental instability which made him a hazard to others; that he knew he had received a discharge from the police force

of Bismarck, at his own request, and was awarded a pension from the police officers' pension fund because of mental problems and that this condition made it impossible for him to discharge the duties of a police patrol officer; and that the defendant had knowledge of these facts at the time of this incident.

The complaint also alleges that bodily harm and injuries to the plaintiff Wall were aggravated by the defendant Zeeb's gross negligence or willfulness in failing to secure medical aid in a reasonable time after Wall had suffered injuries administered by the defendant Zeeb and that, after the injury, the defendant Zeeb falsely claimed a lawful arrest had been made. The complaint alleges that all of said acts on the part of the defendant Zeeb were grossly negligent, wanton and malicious, and were done with reckless disregard for the safety of the plaintiff Wall.

The plaintiff Eugene R. Wall prays judgment for compensatory damages of $100,000, plus punitive damages of $100,000 and demands judgment against the State Bonding Fund, which it is alleged in the complaint is surety for the defendant Zeeb as a police officer, in the amount of the coverage, to wit, $1,000.

The plaintiff Judith B. Wall joins in the complaint and alleges that plaintiff Eugene R. Wall is her husband; that, by the acts of the defendant Zeeb, she has lost the services of her husband for herself and their two-year old daughter; and that she has lost society, companionship, conjugal affections and consortium which she had prior to her husband's injuries and prays damages in the amount of $20,000.

The defendant answered the complaint denying every allegation therein, except as otherwise admitted, qualified or explained. The answer alleges that, at about the time set out in the complaint, the plaintiff Wall was in an intoxicated condition and in possession of an open receptacle of beer in a motor vehicle; that the defendant Zeeb came upon the plaintiff and, in an attempt to assist him and determine his identification, the plaintiff Wall refused to communicate or identify himself, whereupon the defendant Zeeb placed him under arrest for vagrancy.

The answer alleges that the plaintiff resisted arrest and fought with the defendant, striking and hitting him while the defendant Zeeb was in the course of performing his duties as chief of police. In order to perform his duties, the said Zeeb, in completing the arrest of the plaintiff and bringing him to justice, and in order to protect himself and the people of the city of Wilton, followed the plaintiff into a house where, in the course of a further struggle, a tear gas weapon in the possession of the defendant Zeeb was discharged, causing some of the gas to go into the face and eyes of the plaintiff; that the defendant Zeeb did only such acts as were necessary in the performance of his duties as chief of police of the city of Wilton and, in apprehending an escapee from his custody, he used only such force as was necessary to bring the plaintiff under control. The answer also alleges the defendant Zeeb took all reasonable steps to arrange medical care for the plaintiff. He prays that plaintiff's complaint be dismissed.

■ In the specifications accompanying the defendant's notice of motion for a new trial, he assigns only errors of law and excessive damages which appear to have been given under the influence of passion or prejudice. The specifications assigning errors of law fall into three groups—errors in instructions given, errors denying motions for mistrial, and errors in the reception and exclusion of evidence. These specifications do not mention the insufficiency of the evidence. Our review of the order denying the motion for a new trial is limited to errors specified and does not include a review of the sufficiency of the evidence, except as may be necessary in reviewing the question of damages.

■ The appellant has the burden of presenting a record affirmatively showing error. Mills v. Roggensack, N.D., 92 N.W. 2d 722; Robbins v. Robbins, N.D., 70 N.W. 2d 37.

■ The defendant claims the court erred in instructing the jury as to the defendant's mental incompetency for the reason that the allegations of the complaint were not sustained by a sufficient quantum of evidence to take the issue to the jury.

We said in Schwabel v. First National Bank, 53 N.D. 904, 208 N.W. 236, that the scope of the instructions must be determined by the pleadings and by the evidence in the record. This is a universally recognized rule. If the instruction raises issues not raised by the evidence, or contrary thereto, the error requires a reversal of the judgment when such unwarranted instruction is calculated to mislead the jury to the prejudice of the complaining party. Teegarden v. Dahl, N.D., 138 N.W.2d 668; Schwabel v. First National Bank, supra; Foster v. Dwire, 51 N.D. 581, 199 N.W. 1017, 51 A.L.R. 21. However, instructions given on issues not warranted by the evidence, although erroneous, constitute reversible error only when calculated to mislead the jury and where such an instruction could not possibly mislead the jury or have affected the verdict adversely to the complaining party, it does not constitute reversible error. Mills v. Roggensack, N.D., supra. The issue was raised by the complaint and a review of the evidence discloses a sufficient quantum of evidence to take the issue to the jury. We have made reference to the complaint summarizing therefrom earlier in this opinion.

The undisputed evidence introduced shows that the defendant Zeeb, a war veteran, had been treated in several mental hospitals for his mental problems and that in 1959, while employed by the Bismarck Police Department, the defendant wrote a letter to the department requesting that he be relieved of his duties as a policeman because of his mental and physical disabilities and placed on a disability pension. The evidence reflects that shortly thereafter, and in 1959, the defendant was relieved of his duties as a police officer by the city of Bismarck for disability reasons and placed on a disability pension, and that he was drawing such pension at the time of the incident involved in this action.

The record also establishes that about a year after the defendant qualified for the disability pension, he was rehired by the Bismarck Police Department as a records' clerk and that, within less than two years, he was discharged and again placed on the pension list. It also appears that 23 days before the incident involved in this action, the defendant had reapplied to the Bismarck Police Department but was rejected because it was felt that he was unfit for the position. The evidence establishes that during the month before the incident involved in this action, the defendant Zeeb had been examined by several doctors regarding his capacity as a policeman. These examinations were made in connection with his application to be re-employed by the Bismarck Police Department. Neither side called any of these doctors to testify.

The trial court, in its memorandum decision denying a new trial, stated it felt the evidence of mental instability was relevant and, since it was submitted, it was proper to summarize in its instructions from the allegations on this issue contained in the plaintiff's complaint. We agree.

■ The defendant objected to the introduction of the letter of 1959 where the defendant Zeeb requested the Bismarck Police Department that he be relieved of his duty as a policeman and placed on a disability pension because "I find that my physical, mental and nervous condition to be such that I can no longer perform my assigned duties as a police patrolman for the City of Bismarck, No. Dak." The objection was overruled and the defendant specified this as error.

We do not find it was error to have admitted the letter in evidence as being too remote. The admission of this evidence was a matter resting largely in the discretion of the trial court. "Whether any evidence should be excluded for remoteness rests largely in the discretion of the trial court." Lake v. Neubauer, N.D., 87 N.W.2d 888; Kemmer v. Sunshine Mutual Insurance Co., 79 N.D. 518, 57 N.W.2d 856. The question here was the defendant's condition at the time of the alleged assault. The letter, together with the connecting evidence of disability pension, the trial period employed as a file clerk, the hospitalization and the recent examination by doctors, coupled with the defendant's failure to call them as witnesses, are all factors the weight of which was for the consideration of the jury. We find the admission of the letter in evidence was not error.

Next, the defendant specifies it was error for the court to have instructed the jury, in part, as follows:

The burden of proof is on the Defendant, Al Zeeb, to prove that he did not use any unnecessary or unreasonable force.

To the giving of this instruction, the defendant duly excepted. We are of the opinion that the defendant is right in his contention.

The trial court defined assault and battery to the jury and then instructed:

An assault or battery is not unlawful when necessarily committed by a public officer in the performance of any legal duty.

If, after an officer has given a person notice of intention to arrest the person and the person either flees or forcibly resists, the officer may use all necessary means to effect the arrest and the presumption is that an officer performs his duty correctly, which presumption prevails unless overcome by definite evidence to the contrary.

The law protects an officer who is trying to do his duty as long as he does not use more force than necessary and in making an arrest he is under no obligation to retreat, but has both a legal right and official duty to press forward and accomplish his object by overcoming any resistance offered.

However, our law provides that a person who is arrested shall not be subjected to unnecessary or unreasonable force, nor to any greater restraint than is necessary for his detention.

In determining a Police Officer's liability for assault and battery inflicted on a person in connection with an interrupted arrest, the conduct of the Police Officer must be weighed in light of the circumstances in which he acted and not by incidental results thereof.

If a Police Officer uses more force than is necessary or uses unreasonable force, his use of such force constitutes an assault and battery.

Following the above-quoted instructions, the court gave the instruction complained of and now specified as error.

The plaintiff in the complaint alleged that if the defendant attempted to make a lawful arrest, the arrest was made by using more force than was reasonably necessary, or that it was made by subjecting the person arrested to unnecessary risk and serious harm. The defendant, in his answer, admits the plaintiff was placed under arrest and alleges that plaintiff resisted arrest and fought with the defendant, striking and hitting him, and that he did only such acts as were necessary in the performance of his duties as a police officer of the city of Wilton in effecting an arrest and prevention of escape. The evidence is in conflict. The defendant testified that the plaintiff was placed under arrest before the altercation which resulted in the plaintiff's injury, and the plaintiff testified he was not placed under arrest until after the altercation and injury. We think the trial

court correctly instructed relative to the presumptions and the statutes under the circumstances. But the last paragraph of this group of instructions nullifies the presumption to which the defendant is entitled when it places upon him the burden of proof to show that he did not use any unnecessary or unreasonable force.

In Schell v. Collis, N.D., 83 N.W.2d 422, we held a peace officer lawfully attempting to take a violator of law into custody is under no obligation to retreat or retire to avoid the necessity of using force, that the presumption is always in favor of the correct performance of his duty, and that every intendment will be made to support such presumption. The conduct of an officer must be weighed in the light of the circumstances under which he acted and not by the incidental results thereof.

Section 29-06-13, N.D.C.C., provides that if, after notice of intent to arrest, the defendant either flees or forcibly resists, the officer may use all necessary means to effect his arrest.

Assault was correctly defined by the trial court as "any willful and unlawful attempt or offer with force or violence, to do a corporal hurt to another." Battery was also properly defined by the trial court as "any willful and unlawful use of force or violence upon the person of another." Assault and battery not being unlawful when necessarily committed by a public officer in the performance of his legal duty in making the arrest, the burden of proof is upon the plaintiff to prove that Al Zeeb, the police officer, used unnecessary or unreasonable force.

The challenged instruction is in conflict with the statutory presumption and prejudicial. The defendant never has the burden of proving what he may show as a defense under a general denial, but the burden still remains with the plaintiff based on the whole evidence.

The instrument employed by the defendant Al Zeeb in the discharge of tear gas is denominated a "HERCULES TEAR GAS FOUNTAIN PEN (TYPE) PROJECTOR." It was received in evidence as an exhibit. It has the general structural appearance of an ordinary fountain pen. It is made of metal, has an overall length of five inches, a barrel length of one and three-fourth inches, and weighs two ounces. By unscrewing, it comes apart and permits the insertion into the barrel of a .38 caliber tear gas cartridge. The projector contains a firing pin attached to a spring tension plunger, to which is attached a button that extends to the outside of the case of the instrument. When the button is pulled back against the spring tension, it may be put in a safety position by sliding the button to one side and into a safety slot. To fire, the button is pulled backwards to the left, out of the safety slot, and drawn further back to increase the spring tension. It is then released. When the button is released, the spring pushes the plunger and firing pin forward. The firing pin strikes the primer contained at the rear of the tear gas cartridge. This in turn sets off a small amount of powder and the explosive force drives out the tear gas, which is placed in the cartridge immediately ahead of the powder and held in position by sealing wax.

According to the operating instructions introduced as an exhibit, the instrument has an effective range of about eight to twenty feet, depending upon wind velocity and direction. The cartridge fires with a loud report equal to that of a pistol and projects the gas instantly away from the user. According to the warning contained in the operating instructions, if fired at close range (less than three feet), the blast may cause injury to the eyes.

A box in which the tear gas projector was received when purchased was also received in evidence. On the inside of the cover of the box is contained a notice which reads as follows:

Hercules tear gas pens are constructed with a patented groove on the barrel so that the barrel will rupture if FIXED

or commercial factory loaded ammunition is used. These pens are perfectly safe to use with STANDARD TEAR GAS AMMUNITION ONLY. This device is not considered a deadly weapon or firearm.

The defendant excepted to and has now specified as error several instructions given by the trial court to the jury. These instructions are as follows:

The instrument used in the discharge of tear gas is a firearm.

\* \* \* \* \* \*

There is a presumption of law that where a firearm is in the hands of the Police Officer and it is discharged by accident and without intent to fire it and it injures another person, that the Police Officer was negligent in the handling of the firearm.

\* \* \* \* \* \*

\* \* \* While Police Officers may make all reasonable efforts to apprehend alleged law violators the Officer is not justified in discharging firearms intentionally or negligently or intentionally discharge a firearm so as to cause injury to a person arrested for the alleged commission of a misdemeanor and under such circumstances the intent of the Officer is immaterial.

Earlier in this opinion we set forth the issues as framed by the pleadings. This issue in respect to the discharge of the tear gas projector was whether it was negligent or accidental and, secondly, if the tear gas projector was negligently handled, whether such negligence was the proximate cause of the plaintiff's injury.

We now examine the evidence to determine the issues as framed thereby.

It is undisputed that the defendant Al Zeeb was an on-duty police officer for the city of Wilton, dressed in his police uniform at the time of the incident. It is also undisputed that the plaintiff Wall was in his Volkswagen automobile, which was parked a short distance from his mother's abandoned home located on the outskirts of the city; that the Volkswagen carried a California license plate; that the defendant Al Zeeb was patrolling when he discovered the Volkswagen automobile parked near the abandoned house at about 2:00 a. m. He went to investigate and found the plaintiff seated therein, apparently asleep.

The testimony from this point on is in conflict in many respects. The defendant testified that the motor of the Volkswagen was running and that as he approached it and opened the door, he saw the plaintiff inside. He was seated in the back seat on the left side and was holding an open can of beer in his hand. He appeared to the defendant to be either asleep or unconscious. The defendant removed the can of beer from the plaintiff's hand, took it to the police car and left it in charge of his daughter who was seated there. He then returned to the Volkswagen. He did not know the plaintiff and felt the plaintiff was in danger of injury or death from carbon monoxide poisoning.

He sought to remove him from such dangers and the plaintiff refused his assistance and to disclose his identity. When the defendant told the plaintiff that he could not sleep in his automobile, the plaintiff said "no SOB could tell him where he could stay." The defendant then claims he placed the plaintiff under arrest for vagrancy and so informed him.

At this point an altercation occurred, defendant testifying he took hold of the plaintiff's arm and the plaintiff swung at him, partly knocking him down. Thereupon the defendant proceeded to strike the plaintiff with his fist, knocking him down on two separate occasions. Although the defendant carried a revolver, blackjack, handcuffs and tear gas projector, he did not use these instruments. The plaintiff got up and ran into the abandoned house and the defendant pursued. The defendant removed his flashlight and tear gas pro-

jector from his uniform and took the tear gas projector off safety position. As he entered the house in pursuit of the plaintiff, he carried the tear gas projector in his right hand and the flashlight in his left hand. The house was dark except for some light admitted from the police car parked outside. The plaintiff ran to the far end of the small house where he stopped and turned around. The defendant took hold of plaintiff's arm and tried to pull him outside but plaintiff resisted and fought him off. During the ensuing scuffle, the tear gas projector accidentally discharged, injuring the plaintiff.

Defendant testified he had not aimed the tear gas projector, that he had no recollection of pulling back the plunger and releasing it, and that he did not remember the exact distance he was away from the plaintiff when it discharged. Thus, it is the contention of the defendant that he had placed the plaintiff under arrest but he resisted and attempted to escape; that the defendant, in pursuance of his duties as a police officer, pursued him to prevent an escape and when he caught the plaintiff, he again resisted arrest. In the ensuing struggle the tear gas projector accidentally discharged, injuring the plaintiff.

The plaintiff Eugene Wall testified he was 28 years of age and married. He had grown up in and around the Wilton area where his parents were farmers and his mother also taught rural school. He entered the service when he was 17 and served until he was 21. He then returned to Wilton for a short time but left and went into electrical construction work in 1959. He worked at various places about the country for his employer. There was a temporary layoff due to shortage of materials and he returned to North Dakota in March of 1964. He was temporarily staying at Bismarck, North Dakota, and was taking flying lessons at Mandan. He testified he had been an airplane pilot for several years but that he wished to obtain a commercial pilot's license so he could do crop spraying. On April 18, 1964, he got up at 5:00 a. m. to take some flying lessons. Bad weather set in and he was requested by his flying instructor to take a supply of crop spraying posters and put them up in various communities. He spent the remainder of the day doing this and ended up at Wilton at about 6:30 p. m. He visited with his brother, who lived in Wilton, and with various acquaintances and friends. During the course of the evening he had several drinks with his friends in a bar. He also visited with friends at a public dance. After leaving the dance, he went back to the bar and purchased a six-pack of beer and placed it in his Volkswagen. He intended to return to Bismarck but he changed his mind because he had been involved in an accident in 1962 on the road between Bismarck and Wilton. He was tired and drove his Volkswagen to the property owned by his mother which consisted of two lots and a small, vacant two-room house. He parked his Volkswagen near the house, shut off the lights and the ignition, slid over to the right-hand seat and went to sleep. It was a dark night and the nearest street light was about one block away. He testified it was near midnight and the next thing he knew, he was outside on the ground with his head hurting and spinning. When he turned to get up, a man hit him from behind on the left side of the head. This blow knocked him down again. He then got up, stumbled, and ran into his mother's house, the door to which was only six or eight feet away. The man who had struck him was unknown to the plaintiff and ran behind him beating him on the arm and shoulder. He testified that he was dizzy and that things were spinning when he ran into the house. He went into the bedroom and sat down on the bed. The man followed him, grabbed him around the head or neck with one hand and shot him in the eyes with the tear gas gun. He then passed out and it was not until he regained consciousness that he was informed he was placed under arrest for vagrancy. He tes-

tified he again passed out and when he awakened he was in jail.

We find the issues as framed by this evidence also raise the issues for decision by the jury whether the discharge was accidental or caused by negligence and, if the tear gas projector was negligently handled, whether it was the proximate cause of the plaintiff's injury. In view of the issues as framed by the pleadings and the evidence, we are of the opinion that the instructions are in error and that this error was prejudicial to the defendant. Nowhere do we find in the instructions that the court instructed as to accident. The evidence, in many material respects, is in conflict. On the basis of the evidence the jury may have found that the police officer was doing his duty and had placed the plaintiff under legal arrest and that the plaintiff resisted and attempted an escape. Section 29–06–13, N.D.C.C., provides that if, after notice of intention to arrest, the subject either flees or forcibly resists, the officer may use all necessary means to effect his arrest.

The trial court properly instructed that the law protects an officer who is trying to do his duty as long as he does not use more force than necessary and, in making an arrest, he is under no obligation to retreat but has both a legal right and official duty to press forward and accomplish his object by overcoming any resistance offered. The person arrested shall not be subjected to unnecessary or unreasonable force or to any greater restraint than is necessary for his detention. See Schell v. Collis, N.D., 83 N.W.2d 422.

█ If the jury did believe that the defendant Al Zeeb, a police officer, had made a lawful arrest of the plaintiff and he was therefore in the lawful custody of Zeeb when, by force or any other manner, he escaped from such custody by running into the house, Zeeb could lawfully have pursued and retaken his prisoner. See Sections 12–16–02, 12–16–06, and 12–16–08, N.D.C.C. Such escape would constitute another crime, Section 12–16–06, N.D.C.C.

If, therefore, the jury should find that the pursuit of the plaintiff into the house was a legal pursuit by an officer in the performance of his duty, in an attempt to apprehend an escapee from lawful arrest, it would then become the jurors' duty to determine whether the discharge of the tear gas projector was accidental, negligent or intentional and, if it was intentional, whether it was negligently done or whether the officer subjected the plaintiff to unnecessary or unreasonable force to effect the arrest after giving the officer the benefit of the presumption of correct performance of his duty. The conduct of the officer must be weighed in the light of the circumstances under which he acted and not by the incidental results thereof. Schell v. Collis, supra.

In the light of these principles, we will now further consider the instructions specified as error.

█ We think it was error for the trial court to have instructed that the tear gas projector was a firearm and that there is a presumption of law that, where a firearm in the hands of a police officer is discharged by accident without intent to fire it and it injures another, the police officer was negligent in the handling of the firearm. It is true that such an instruction in a proper case may be the correct law but we do not feel it is applicable here for the reason that the jury may have found under the evidence that the tear gas projector discharged accidentally during a struggle while the officer was performing a legal act.

It was held in Graham v. Ogden, La.App., 157 So.2d 365, that a deputy sheriff was not liable for the wrongful death of a bystander when his gun accidentally discharged during a struggle in which he was attempting to subdue a misdemeanant who had been disturbing the peace by being drunk and disorderly. It appears the shooting occurred in a bar where a drunk and disorderly person had been placed under arrest and he suddenly and violently attack-

ed the officer. During the ensuing fight the police officer knocked the subject to the floor with his blackjack. While on the floor, he kicked the officer, got up and again advanced toward the officer. At this point the officer drew his pistol and fired it into the floor to deter the subject. However, he was not deterred and the fight continued. In a frantic struggle the pistol discharged killing a bystander who was sitting at the bar watching the fight. The court said it appeared the unfortunate accident was the result of the action of the offender in resisting the officer in attempting to take the pistol from him and that, during the struggle, the pistol fired the bullet striking the deceased and killing him instantly. The court concluded that these facts did not prove any degree of negligence on the part of the officer.

In the case of Berry v. Hamman, 203 Va. 596, 125 S.E.2d 851, which was an action by one police officer against another police officer for injuries suffered as a result of alleged negligence in firing a gun while the parties were attempting to apprehend a felon, the Supreme Court of Virginia reversed the trial court's finding for the plaintiff on the ground that the defendant officer was engaged in a lawful act while under great stress and was, therefore, not negligent in the unintentional shooting of the plaintiff under the reasonable belief that he was shooting at the escapee felon, that the plaintiff police officer had moved into the open and assumed the risk of the injury incurred. The court said:

One acting under the stress of an emergency is to be judged for negligence with a different measure from that used in weighing acts done under normal circumstances and conditions. To constitute negligence under the "sudden emergency" doctrine it must be such that it cannot be said that a reasonably prudent person, under the same circumstances and conditions, might have acted in the same manner.

In that case three officers had gone to a house to apprehend a dangerous felon whom they believed to be spending the night in the house. Two officers went to the front door and the defendant officer was stationed at the back door. When the officers at the front door knocked seeking admittance, the felon came out by the back door with gun in hand. The defendant officer called him to halt and the felon answered by putting his gun to his shoulder. The officer thereupon fired but missed. The felon ran and the officer pursued him and, upon seeing a man on the sidewalk in the front of the house whom he believed to be the felon, he fired at him. However, he hit one of the other officers who had moved from the front door to the sidewalk. The court said:

When the felon escaped after being fired upon, it was Berry's [the defendant officer] duty to pursue him and use whatever force was reasonably necessary to apprehend him.

The court found that the shooting of the plaintiff officer was unintentional and purely accidental, that the defendant officer was engaged in a lawful act while under great stress, and that he shot under the reasonable belief that he was shooting at the escaping felon.

Under the circumstances of this case, we think it was error for the court to have instructed that the fountain pen tear gas projector was a firearm. The word "firearm" has the connotation of a dangerous weapon and, although the tear gas projector may be regarded as a dangerous weapon when employed in too close proximity of another person and if aimed at the eyes of that person it may not be dangerous when used properly. The fact is that the tear gas projector, by being fired close to the face of the plaintiff, caused loss of eyesight; but, from that fact alone, we cannot say that the instrument is characteristically dangerous.

It appears from the evidence in this case that the tear gas projector could only

be used to discharge tear gas and has a very limited range. If, however, it is discharged within three feet of a person's eyes, it may cause injury. It is of course an instrument of defense at close range and must be handled with respect.

A firearm is defined by Webster's New Third International Dictionary as "a weapon from which a shot is discharged by gunpowder." A weapon is defined as "anything used or usable in injuring, destroying, or defeating an enemy or opponent." A shot is defined as "material propelled by shooting." Webster defines tear gas as "a solid, liquid, or gaseous substance that on dispersion in the atmosphere blinds the eyes with tears but does not damage them."

We find few cases which have attempted to classify a tear gas projector of this type. In People v. Anderson, 236 App.Div. 586, 260 N.Y.S. 329, it was held that a fountain pen primarily intended for discharge of tear gas was a "pistol" or "revolver" under the evidence in a prosecution for unlawfully possessing a firearm. In that case a pistol expert of the police department testified that he conducted two experiments with the instrument in question and succeeded in discharging two cartridges from it, one a shot cartridge and the other a Luger cartridge. He also testified that in his opinion the bullet upon discharge from the instrument would travel a distance of from two to three blocks and in his experiment it penetrated a board three-fourths of an inch thick, which was sufficient force to pass almost through a human body if it did not strike a bone. Another witness testified that he had fired a similar instrument by hand. The court said that the instrument was dangerous and because the instrument acts by force and gunpowder, it is a firearm and, because it is a small light firearm, it is a pistol.

In State v. Umbrello, 106 N.H. 336, 211 A.2d 400, the court found that a fountain pen tear gas gun, which was not shown capable of any purpose other than the discharge of tear gas without the use of a special steel adapter, was not a "loaded pistol" within the statute prescribing as a crime the carrying of a loaded pistol concealed on a person without a license.

In United States v. Decker, 292 F.2d 89 (6th Cir. 1961), it was held that a tear gas gun capable of firing a shotgun shell was a firearm within the meaning of the National Firearms Act. 26 U.S.C.A. Secs. 5841–5849. In that case experiments with a tear gas gun showed that it could fire a .410 gauge shotgun shell without rupturing the barrel or causing any structural damage thereto. The court made the following comment at page 90:

> The weapon in question was a tear gas gun. The difference between this gun and the conventional tear gas pencil is that the pencil usually fires a much smaller container of gas. * * *

It also stated:

> * * * a tear gas gun capable only of discharging tear gas would not be considered as a firearm.

Cf. United States v. Fogarty, 344 F.2d 475 (6th Cir. 1965).

In State v. Seng, 89 N.J.Super. 58, 213 A.2d 515, it was held that a tear gas pen gun which used air to effect release of the gas was not the type of weapon sought to be regulated by the legislature and that the sale of such guns to be used as a defense from attack or molestation on streets was not punishable as a misdemeanor. The court applied the rule of statutory construction, the maxim *expressio unius est exclusio alterius,* and pointed out that their statutes listed regulated weapons such as machine guns, automatic rifles, pistols and revolvers, or other firearms. It concluded that this class might then be characterized by the ability to fire a projectile by means of an explosive charge and reasoned that a tear gas pen gun which used air to effect the release of gas does not have these characteristics and was thus excluded from the class.

In Village of Barboursville ex rel. Bates v. Taylor, 115 W.Va. 4, 174 S.E. 485, 92 A.L.R. 1093, the West Virginia Supreme Court granted a new trial in an action for damages on a claim that a police officer, in arresting the plaintiff for drunkenness and disorderly conduct, fired a small tear gas gun near the plaintiff's face and injured him so severely that he lost the sight of his eye. The court said that the question of whether the "fountain pen tear gas gun," as therein described, is a dangerous or deadly weapon within the meaning of their statute, inhibiting the carrying of such weapons, is a question of law which must depend upon a full showing not only of the probable effects of the firing of such charges from the gun but its adaptability for firing other charges and its general potentialities as well. However, whether an implement used in a homicide or an assault was a dangerous or deadly weapon may be a question of fact for jury determination, depending upon the circumstances of its use.

The court said that in approaching such problems there are fundamental principles for judicial guidance. The court reasoned that the statute against carrying dangerous or deadly weapons is intended to govern such weapons as are dangerous per se—inherently, intrinsically or characteristically; and that there are two classes—(1) articles intended as weapons, and (2) articles the primary use of which are not as weapons but which are readily adaptable to that use. For example, a butcher knife is ordinarily not considered as a dangerous or deadly weapon but may, nevertheless, be a dangerous or deadly weapon if improperly used. Therefore, the statutes inhibiting the carrying of dangerous or deadly weapons are intended to include those articles which are intended as weapons. Thus a weapon which has caused death or serious injury may be regarded as a deadly weapon when employed in the manner in which it was used when the injury was produced but, though a weapon may be dangerous when used in a certain manner, it may not be dangerous when such manner of use is avoided. We think the term "firearm" carries a connotation that the instrument is a dangerous, deadly weapon per se and, therefore, the tear gas projector, as described in the evidence and produced at this trial, does not warrant that it be termed a firearm. It is so constructed that it will not permit the firing of a bullet. It is safe to use only with standard tear gas ammunition if discharged more than three feet from the person's eyes and is not dangerous per se. The use for which it is intended and readily adaptable is not the cause of serious injury or death to a person.

Under the circumstances of this case, we find that the three instructions set forth above, to which the defendant excepted and has specified as error, were erroneous and prejudicial to the defendant. These instructions destroyed the presumption of correct performance of duty by an officer, to which presumption the defendant was entitled if the jury finds the facts to be as testified to by the defendant. We feel the instructions complained of were misleading and prejudicial in this case.

 The defendant also specified as error the refusal of the trial court to admit in evidence the notes made by the defendant in his note book pertaining to the incident immediately following the arrest; that the court erred in refusing to admit in evidence a written statement taken from the defendant by the plaintiff's attorney the day following the incident. These offers were made during the redirect examination of the defendant after the plaintiff's attorney had succeeded on cross-examination in causing the defendant to admit he had made certain statements in his deposition taken before trial, which the plaintiff contended were inconsistent with the testimony given at the trial. The offer was made on the basis of an exception to the general rule that prior consistent statements of a witness are not receivable in evidence to corroborate or support him. The order of events was as follows: The incident occurred in the early morning hours of April 19, 1964. Immedi-

ately after the plaintiff had been placed in jail, the defendant made the proffered notes in his notebook. On April 20, 1964, the attorney for the plaintiff took the proffered written statement from the defendant. On July 7, 1964, the attorney for the plaintiff examined the defendant by deposition. The trial was held commencing March 2, 1965. The cross-examination of the defendant occurred during the trial on March 4, 1965. At the cross-examination of the defendant, the attorney for the plaintiff attempted to impeach the defendant as a witness by reading to him a question and the answer he had given as contained in the deposition taken on July 7. This was done in an attempt to impeach some of the testimony given on direct examination. The area of this attack centered on the issue of whether the tear gas projector was discharged by accident or whether it was aimed at the plaintiff and intentionally discharged.

The attorney for the plaintiff read from the deposition the following question and answer:

Q. You mean you meant to get Eugene in the chest and not in the face?

A. That's right.

The question which was read was asked after a series of general questions as to the method to be employed in the use of a tear gas projector and which questions were not directly related to this case. The defendant at the trial attempted to explain on redirect examination that this is what he would have done if he had intentionally discharged the tear gas projector. It was the obvious intent of the plaintiff's attorney to show a recent fabrication of testimony and that it was fabricated for purposes of trial. The defendant argues that the statement given to the plaintiff's attorney was the day following the incident and the notes, both of which were offered in evidence and refused, would have established that the defendant's testimony on direct examination was in accordance with that which he stated in the instruments offered in evidence.

In reading the deposition which was taken by the plaintiff's attorney on July 7, we find that immediately preceding the question, which was read to the defendant and quoted above, the attorney for the plaintiff had asked general questions of the defendant pertaining to the use and manner of use of the tear gas projectors. It was as follows:

Q. Have you had training that has told you that you should be careful that tear gas doesn't get into the face of anyone?

To which he answered:

A. They have never really come out, and said how, my idea of it was to shoot them in the chest.

This was immediately followed by the question quoted above: "You mean you meant to get Eugene in the chest and not in the face?" To this he answered: "That's right."

On redirect examination, the attorney for the defendant offered the aforedescribed exhibits in evidence for the purpose of accrediting the witness under what is sometimes called the "rehabilitation rule," where a witness has been assailed on the ground that the story is a recent fabrication. We believe the exhibits should have been admitted for this purpose.

It is the general rule that prior consistent statements, whether written or oral, are inadmissible as self-serving declarations. 58 Am.Jur., Witnesses, Secs. 817, 818, and 819.

There is a divergence of opinion as to the extent of the right of a party to introduce proof of prior statements of a witness consistent with his present testimony after he has been impeached by proof of inconsistent statements. 98 C.J.S. Witnesses § 624; 58 Am.Jur., Witnesses, Sec. 825. However, it appears generally to be the

rule that prior consistent statements of a witness who has been impeached by charges of recent fabrication may be received to refute the impeaching evidence, if the prior consistent statements were made before the claimed fabrication. 58 Am.Jur., Witnesses, Secs. 828, 829, and 830; 98 C.J.S. Witnesses § 648(3). This is the situation here. The defendant testified, on both cross-examination and direct examination, that the tear gas projector discharged accidentally. The plaintiff's attorney then read from the deposition of July 7 one question and, no matter what the answer, it is indicated from the form of the question that the shooting was intentional. The question placed the witness on the horns of a dilemma. Whether he gave an affirmative or a negative answer, he has admitted that "he meant to get" the plaintiff with the tear gas projector either in the chest or in the face. Both of the exhibits offered were made long before this action was commenced and are consistent with his testimony on both direct and cross-examination. They should have been admitted for the purpose of accrediting the witness but not as substantive evidence.

■ Error was specified on the ground of misconduct of counsel for the plaintiff. It is premised on the claim that counsel for the plaintiff challenged counsel for the defendant to waive a legal right and allow the introduction of evidence which otherwise would be barred. We have examined the record referred to us and are unable to determine from it that the claimed error occurred. Counsel for the defendant caused two letters to be marked as exhibits and offered them in evidence. Counsel for the plaintiff objected on the ground of hearsay. The letters were written by a doctor and dealt with the defendant's condition. Counsel for the plaintiff then stated:

We would make an objection if only two of the letters are taken by the Defense and put in. We would withdraw that objection if all the medical reports were put in.

Counsel for the defense refused and asked the court for a ruling on his offer. It was rejected. Counsel for plaintiff has not assigned as error the refusal to admit the letters he offered. We are unable to determine what legal right he was asked to waive. We see no merit in this specification.

■ Lastly, the defendant argues it was error to admit certain testimony of the ophthalmologist who examined and treated the plaintiff's eyes after the injury. The defendant has specified certain questions calling for opinion testimony of the expert relative to cause, reaction, and effect of delay in initial treatment as error. The basis of the alleged error is pointed as being a failure of the expert to have made, or caused to be made, a chemical analysis of the foreign materials found in the plaintiff's eyes and surrounding area. He testified that different chemicals can effectively be used as tear gas. Therefore, the defendant argues, the expert did not have adequate factual foundation upon which to base an opinion and his testimony should have been rejected as speculative and conjectural. An examination of the evidence adduced establishes that the expert based his opinion on the history of the injury and on facts observed by him in the course of his professional attendance upon the plaintiff. He testified to the facts upon which he based his opinion to the satisfaction of the trial court.

No evidence was introduced to show what chemicals may be used in the manufacture of tear gas, nor was there evidence introduced to indicate a different reaction from different chemicals on the human eye.

The witness testified he was familiar with tear gas from his studies, his service in the armed forces, and his experiences as an ophthalmologist. He testified that he has treated other tear gas cases, the last one being about five years previous, and that he treats, on the average, one person per week for chemical injuries to the eye.

He testified he consulted scientific reference material pertaining to tear gas injuries and had made inquiry of the Bismarck Police Department as to the type of tear gas used and obtained reference material from them. He also testified to the reaction of the material on the eyes, the eyelids, and the skin and premised his opinion testimony on medical probability.

We find the opinion of the expert was based on adequate factual foundation to render it admissible for whatever weight the jury wished to give it in the light of the facts elicited by the defendant and relied upon as a basis for error.

The order denying the motion for new trial is reversed and a new trial is granted.

STRUTZ, ERICKSTAD, KNUDSON and PAULSON, JJ., concur.