VILLAGE OF BARBOURSVILLE *ex rel.* ERNEST BATES *v.* SAM TAYLOR *et al.*

(No. 7860)

Submitted April 17, 1934. Decided May 8, 1934.

*Peyton, Winters & Hereford, W. T. Lovins* and *R. E. O'Connor,* for plaintiffs in error.

*W. H. Daniel* and *Perry & Perry,* for defendant in error.

MAXWELL, JUDGE:

Sam Taylor and B. L. Osburn, defendants, prosecute this writ of error to a judgment of.the circuit court of Cabell County based on verdict against them for $1,500.-00 in favor of the Village of Barboursville, which sues for the benefit of Ernest Bates hereinafter denominated plaintiff.

Taylor was sergeant and tax collector of the village.

He executed bond in pursuance of requirements of Code 1931, 6-2-11, and 8-4-5, in the penal sum of $3,500.00 with Osburn as surety, conditioned for the faithful performance of his official duties. This action is on the bond. The grievance is that Taylor, in arresting Bates for drunkenness and disorderly conduct, fired a small tear gas gun near his face and injured him so severely that he lost the sight of his left eye.

By statute, it is unlawful for any person, without a state license therefor, to carry about his person a revolver or other pistol, dirk, bowie knife, slung shot, razor, billy, metallic or other false knuckles, or other dangerous or deadly weapon of like kind or character. Code 1931, 61-7-1. By section 5 of said article and chapter, police officers and certain other enumerated officers are excepted from the aforesaid inhibition, provided such officer shall have given bond in the penalty of not less than $3,500.00, conditioned for the faithful performance of his duties. It is further provided that he shall be liable on his official bond "for the damages done by the unlawful or careless use of any such weapon or weapons, whether such bond is so conditioned or not." If the tear gas gun used by Taylor was a dangerous or deadly weapon within the purview of the statute, and if he used it unlawfully or carelessly, there undoubtedly would be liability on his bond for the injury inflicted.

In both the trial court and this Court the plaintiff affirmed and the defendants denied that Taylor had used a dangerous or deadly weapon in effecting the arrest of the plaintiff. Because the parties have thus emphasized this phase of the case, we give it full consideration though we recognize that there may be ultimate decision of the case on re-trial independently of this feature.

The implement employed by Taylor is denominated a "fountain pen tear gas gun". It has the general structural appearance of an ordinary fountain pen. It is made of moderately heavy metal, is five and one-fourth inches in length, and weighs one and six-tenths ounces. By unscrewing, it comes apart at the middle and permits the insertion into the barrel of a .38 caliber cart-

ridge. Within the base or stock of the implement is a spring trigger arrangement which is cocked by pulling a plunger. After the trigger is set, the plunger recedes so that the fountain pen appearance is not impaired. The instrument is fired by pressing a small button on the side of the stock; this releases the trigger and drives a firing pin into a cap in the base of the cartridge. When Bates was injured Taylor had used a cartridge loaded with a small amount of gunpowder held in place by a light pasteboard wad. On top of this was the powder which generated the tear gas, likewise held in place by a thin pasteboard cap or wad. It is in evidence that an implement of the sort described will project powder or tear gas from fifteen to twenty feet.

Is a "fountain pen tear gas gun", such as is here described, a dangerous or deadly weapon within the meaning of our statute regulating the carrying of such weapons? Obviously, in the use for which it was intended it is not deadly. Is it inherently dangerous?

Whether an implement used in a homicide or an assault was a dangerous or deadly weapon may be a question of fact for jury determination. The instrument employed may or may not be a dangerous weapon, depending upon the circumstances of its use. 1 Wharton's Crim. Law (12th Ed.), p. 1146. But where the offense charged is the unlawful carrying about the person of a dangerous or deadly weapon, the question of whether a particular instrument comes within the inhibited category is a legal problem to be decided by the court. 8 Ruling Case Law, p. 290; Bishop on Statutory Crimes, sec. 320; *State* v. *Hall*, 20 Mo. App. 397; *State* v. *Page*, (S. D.) 91 N. W. 313.

In approaching such problem, there are fundamental principles for judicial guidance. The statute against carrying dangerous or deadly weapons is intended to proscribe the carrying about the person of such instruments as are dangerous *per se*—inherently, intrinsically, characteristically. There are two classes: (1) articles intended as weapons, such as revolvers, billies, dirks and metallic knuckles; and (2) articles the primary use of which is

not as weapons but which are readily adaptable to that use, as for example, razors (named in the statute) and butcher knives (not named). An article specified in the statute is denominated inherently dangerous, *eo nomine*. An article not specified in the statute, but planned and made for a weapon, is dangerous or deadly within the statutory meaning if in its intended or readily adaptable use it is likely to produce death or serious bodily injury. If it be of that nature, it is of like kind and character to the weapons enumerated in the statute. The mere possesion of a dangerous or deadly weapon about one's person, without a license therefor is an offense. An article made and intended for a weapon is not to be classed as inherently dangerous or deadly because it is capable of producing serious injury or death, but the classification is to be based on a consideration of whether in the use for which it was intended or to which it is readily adaptable it is *likely* to produce death or serious bodily injury. *Clemons* v. *State*, (Okla.) 128 Pac. 739; *Clemons* v. *State*, (Fla.) 37 So. 647; *People* v. *Lopez*, (Cal.) 66 Pac. 965; *State* v. *Bowles*, (Mo.) 47 S. W. 892.

A weapon that has caused death may be regarded as a deadly weapon when employed in the manner in which it was used when the homicide was produced. *Craiger* v. *State*, (Tex.) 88 S. W. 208; *Thomson* v. *State*, (Tex.) 93 S. W. 111; *State* v. *Roan*, (Iowa) 97 N. W. 997; *Benjamin* v. *State*, (Ala.) 41 So. 739. By the same measure, a weapon which has inflicted serious bodily injury may be deemed dangerous when employed in the manner in which it was used when the injury was inflicted. But though a weapon may be dangerous when used in a certain manner, it may not be dangerous when such manner of use is avoided. For example, the weapon in question by being fired close to the face of the plaintiff caused the loss of an eye, but from that fact alone we cannot say that the instrument is characteristically dangerous. What are its potentialities? Can it be employed to project "liquid fire", strong acids, or leaden or steel bullets? At what distance in a direct line from the muzzle of the gun will the sparks generated by the explosion

burn the human flesh? The record does not disclose this information. There must be further development of the possibilities of such instrument before there can be proper judicial determination of whether it is or is not a dangerous weapon within the meaning of our statute which places a ban upon such weapons.

In the New York case of *People* v. *Anderson,* 260 N. Y. S. 329, a tear gas gun (pen) was held to be within the inhibition of the statute prohibiting possession of firearms without license. The instrument seems to have been practically identical with the one involved in this case except that it was heavier. It weighed about three ounces. In that case, however, experiments had been made with the gun and the fact thereby ascertained that it would fire a regular .38 caliber shell loaded with powder and ball. In the opinion of an expert, the ball was fired with sufficient force probably to pass entirely through a human body. The court said: "No particular form or shape is necessary to constitute a pistol. While the instrument in question may appear to be harmless, it becomes a very deadly weapon when used as a pistol. In this particular case, in order to deceive the public, and prevent detection, the instrument is given the harmless appearance of a fountain pen. That the weapon is dangerous was demonstrated by the fact that a bullet was discharged as from any ordinary revolver. The great force possible and the very substantial nature of this metal machine are apparent only by experimental use."

The fact, as testified in this case, that ordinarily no deleterious effects are produced by the firing of tear gas from an instrument such as is here involved does not demonstrate that it is not a dangerous weapon. Loaded with a tear gas shell and fired at a distance of several feet, it may not be dangerous, but when fired at very close range, as in the case at bar, it may be very dangerous. If loaded with a bullet or strong acid, its dangerous character would be manifest. The question is whether its normal or adaptive uses are such as are *likely* to produce serious bodily injury. Upon more complete de-

velopment of the matters discussed, there may be judicial determination of the status of the instrument.

But, though counsel have placed strong reliance in their respective affirmance and denial of the dangerous character of the "gas pen" as decisive of the case, we find that there is another very important element.

The bond in suit is primarily Taylor's official bond and is only incidentally within the purview of the statute against the unlawful possession of dangerous or deadly weapons. The bond is conditioned, *inter alia*, that he "shall well and faithfully perform all the duties of his said office." Such requirement is sufficiently broad to cover any act undertaken by him *colore officii*. It would apply, for example, if the officer, in making an arrest, had wantonly beaten his prisoner with his fist. The said language is meant to apply to whatever may be done by the officer under color or by virtue of his office. *Lucas* v. *Locke,* 11 W. Va. 81, 91; *Wheeling* v. *Black,* 25 W. Va. 266; 282; Mechem's Public Officers, sec. 284; Murfree on Official Bonds, sec. 303. Many cases hold that an officer in making an unlawful arrest acts *colore officii,* and that liability therefor attaches upon his bond under the provision thereof requiring faithful performance of his duties. *Drolesbaugh* v. *Hill,* (Ohio) 60 N. E. 202; *American Guaranty Co.* v. *McNiece,* (Ohio) 146 N.E. 77; *Clancy* v. *Kenworthy,* (Iowa) 35 N.W. 427; *Gold* v. *Campbell,* (Tex.) 117 S.W. 463.

In *State ex rel. McLaurin* v. *McDaniel,* (Miss.) 27 So. 994, the sureties on a mayor's bond were held liable for acts done by him *colore officii,* and in the line of his official duty, but illegal because beyond his authority. In *Stephenson* v. *Sinclair,* (Tex.) 36 S.W. 137, sureties on a constable's bond were held liable for the value of a horse which he killed when improperly shooting at an escaping prisoner. In *Village of Nixa ex rel. Hedgpeth* v. *McMullin,* (Mo.) 193 S.W. 596, sureties on a town marshal's bond were held liable for his improper dealing with a prisoner whom he had lawfully arrested.

But, under any aspect of the case there was prejudicial error at the trial. This is relied on by the defendants

as ground for reversal. The error lies in plaintiff's instruction No. 1. It told the jury, in substance, that if they believed from the evidence that the discharge of the tear gas gun by Taylor was not accidental but was intentional; that Bates at the time of said discharge was not kicking or attempting to strike Taylor and did not by his actions cause accidental discharge of the gun; and that in discharging the gun, Taylor used more force than was reasonably necessary under the circumstances, they should find for the plaintiff.

The instruction ignored the question of good faith on the part of the officer. An officer in making an arrest is presumed to act in good faith as to the extent of the force employed by him. He must not employ force carelessly or unnecessarily. If he does so and injures the accused, he will be penalized. This is a jury question. But the officer is primarily the judge of the extent of the force to be employed by him under the circumstances, and he will not be deemed to have exercised excessive force unless it appears that he has abused his power and authority. His conduct in such circumstances will not be weighed in "golden scales". *State* v. *Pugh*, (N.C.) 7 S. E. 757. In the stress of such circumstances, if an officer uses greater force than the circumstances really require, as later deliberately appraised by a court or jury in the tranquillity of a courtroom, such appraisal does not necessarily operate in condemnation of the officer. His conduct must be weighed in the light of the circumstances as they arose. *Davidson* v. *Allam*, 143 Va. 367, 130 S.E. 245; *State* v. *McNinch*, 90 N.C. 695; *Stinnett* v. *Commonwealth*, 55 Fed. (2d) 644; 2 Ruling Case Law, p. 471. In a case such as at bar a binding instruction for the plaintiff which ignores this element is highly prejudicial. This is analogous to a homicide or assault case where the accused is charged with having used excessive force where he claims to have been acting in self-defense. His conduct must be weighed in the light of the circumstances under which he acted and not measured by subsequently developed facts. *State* v. *Stockton*, 97 W. Va. 46, 124 S.E. 509; *State* v. *Clark*, 51 W. Va. 457, 41 S. E.

204; *State* v. *Zeigler*, 40 W. Va. 593, 21 S. E. 763.

For reasons stated we reverse the judgment, set aside the verdict, and remand the case for new trial.

*Reversed and remanded.*