JAY THOMPSON *v.* NORFOLK & WESTERN RAILWAY COMPANY *et al.*

(No. 8217)

Submitted October 30, 1935. Decided December 10, 1935.

706

‘ *Goodykoontz & Slaven, Fred Kopp* and *F. M. Rivinus,* for plaintiffs in error.
*Hogg & Crawford,* for defendant in error.

MAXWELL, JUDGE:

The Norfolk & Western Railway Company and John Sutfin,

one of its special police officers, appointed by the Governor under authority of statute (Code 1931, 61-3-41), prosecute error to a judgment against them on verdict for $3,500.00 in the circuit court of Mingo County.

The plaintiff was shot and seriously injured between knee and ankle of the right leg as he was fleeing from arrest at the site of a moonshine still in said county. Three peace officers participated in the raid, to-wit, John Sutfin, W. R. Sutherland, who is likewise a special officer of the railway company and a defendant to this action, and Corporal R. C. Dilley, a state policeman.

Within a period of months, a large number of oil-containing steel drums of the railway company had been stolen from its right of way. Of that number, several were taken within a few days prior to the 29th of August, 1934. A superior officer of Sutfin's in the railway service directed him to investigate the matter. Sutfin went from his home at Kenova in Wayne County to Williamson in Mingo County and got in touch with Corporal Dilley who, together with two other state policemen, were on duty there. The matter was discussed and the sheriff of the county was called into the conference. It was suspected that the missing oil drums were being used by moonshiners in the Burning Creek section of said county.

On the following morning, August 29, 1934, in pursuance of said conference, the two railway police officers, Corporal Dilley accompanied by two troopers, and four deputy sheriffs proceeded together to the above stated community where they separated into three squads, one of which, composed of Sutfin, Sutherland and Dilley, went up Upper Burning Creek. After traveling about three miles in their automobile they left it and continued on foot. Within a short distance they detected the odor of wood smoke and of mash. Presently they came in sight of two stills, the lower one idle but the upper one, about fifty feet from the first, was in operation and attended by two men who took alarm and fled. One of them, name unknown to the officers, escaped; the other was the plaintiff, whose identity was likewise unknown until after he was taken into custody. As he started to run, at a distance of about 50 or 60 feet from the officers, he was commanded to halt but paid no

heed. Each of the railway police officers fired twice, Sutfin with a rifle and Sutherland with a revolver. The three officers testified that after the shots were fired, plaintiff disappeared around a turn in the little stream on which the stills were located, apparently uninjured, but that in a moment he called to them that he had been shot; that when plaintiff disappeared from their view he was still running fast; that with the injury from which they found him suffering when they went to him he could not have run from the bend in the stream to that point, therefore, they had not shot him; and that two other shots were fired by an unknown person in the vicinity. The plaintiff testified that instantly before he was shot he looked back and observed Sutfin with his rifle leveled at him, also that Dilley was in the uniform of a state policeman.

On behalf of the defendants, it is urged that the evidence does not sustain the theory that either Sutfin or Sutherland shot the plaintiff, and that in no event is there liability upon any of the defendants because the officers, in the discharge of their duty, were endeavoring to arrest a fleeing felon and did not use unreasonable force.

We are at a loss to determine from the record the basis on which the jury could say with any degree of certainty that it was Sutfin who shot the plaintiff. Corporal Dilley, called as a witness for the plaintiff, testified, as did Sutfin and Sutherland, that he saw the plaintiff running after the firing had ceased; that he was found wounded, and prone on the ground, 25 to 45 feet from where he disappeared from view; that his wound was so severe he could not have walked or run after receiving it. He received a compound, comminuted fracture of both bones of the right leg. Though his back was toward the officers as he ran, the bullet entered not from the rear but from the side. A section of bone and much tissue were torn away. There was at least one other armed person in the immediate vicinity because the officers heard two shots fired besides their own. Their testimony differs as to whether these shots were immediately before or immediately after the officers fired. On this showing, the plaintiff's testimony that as he glanced back he saw Sutfin with his rifle leveled at him, and Sutherland's testimony that his two shots were not fired

at plaintiff, would seem to be scant basis for a finding that Sutfin fired the shot that inflicted the injury. Corporal Dilley is emphatic in his testimony that the plaintiff was shot "after he had disappeared" from the view of the officers. But even if this testimony is to be disregarded and the possibility of the wound's having been inflicted by an unknown person be eliminated, and the responsibility be placed on the officers, we are unable to perceive how it can be said with assurance that it was Sutfin and not Sutherland who fired the bullet which struck the plaintiff. The problem then is narrowed to the query as to whether the railway company is liable in damages to the plaintiff, on the hypothesis that he was unjustifiably wounded by one of the company's special police officers.

At the time of this affair, were the two special officers acting as agents of the Norfolk & Western Railway Company, or were they acting for the people in the discharge of the duties of public officials?

Our statute which provides for the appointment of special police officers by the Governor, at the instance of steam or electric railway companies, contains this language: "Every police officer appointed under the provisions of this section shall be a conservator of the peace within each county in which any part of such railroad may be situated, and in which such oath or a certified copy thereof shall have been filed with the clerk of the county court or other tribunal established in lieu thereof; and, in addition thereto, he shall possess and may exercise all the powers and authority, and shall be entitled to all the rights, privileges and immunities, within such counties, as are now or hereafter may be vested in or conferred upon the regularly elected or appointed constables of such county." Code 1931, 61-3-41.

An individual commissioned by the Governor as a special police officer occupies a dual role. Whether in a given instance, he acts as the private agent of his employer or as a public official will depend on the attending circumstances. It is a general proposition that such special officer is deemed to act in pursuance of his public duty when he is attempting to vindicate the law and bring violators thereof to justice. Al-

though paid by his employer, he is *prima facie* a public officer and not a private servant. *McKain* v. *Railroad Co.*, 65 W. Va. 233, 64 S. E. 18, 23 L. R. A. (N. S.) 289; *Layne* v. *C. & O. Railway Co.*, 66 W. Va. 607, 67 S. E. 1103; *Foster* v. *Railway Co.*, 140 Mich. 689, 104 N. W. 380; *Brill* v. *Eddy*, 115 Mo. 596, 22 S. W. 488.

But if, while acting within the scope of his private employment, such special officer wrongfully inflicts injury upon another, the employer will be liable. *Layne* v. *Railway Co.*, *supra; Moss* v. *Railroad Co.*, 75 W. Va. 62, 83 S. E. 721, L. R. A. 1915C, 1183; *Sharp* v. *Erie Railroad Co.*, 184 N. Y. 100, 76 N. E. 923. Ordinarily it is a question of fact for jury determination as to the character in which the officer was acting. *Brill* v. *Eddy, supra; Sharp* v. *Erie Railroad Co., supra*. But in such circumstances the jury's verdict will not be conclusive if it is not supported by the evidence. *McKain* v. *Railroad Co., supra*.

Special police officer Sutfin, at the direction of a superior officer of the railway company, instituted an investigation to ascertain, if possible, who had stolen certain steel drums belonging to his employer. Then, receiving confidential information that probably moonshiners in a certain section of Mingo County had taken the drums, he made contact with the state police and the sheriff, with the result that a posse was formed to make a raid on the moonshiners. The corporal of the state police testified that he had been receiving complaints that illicit distilling was being carried on in the Burning Creek section of Mingo County. It was in pursuance of the official arrangement noted that the still was raided where the plaintiff was found and wounded. The activities of the posse were directed at moonshiners, not at petty thieves, nor at violators of rules or regulations of the railway company. The primary purpose of all the officers concerned was to destroy illicit distilling outfits and to arrest violators of the law against such practices. In so proceeding, they were undertaking to uphold the dignity of the law. In the role in which they were acting, the two special police officers were no less public officials than were their associates in the enterprise, and in our judgment, were clearly within the purview of the

above quoted provision of the statute. Considering that they were acting as public officials, their employer is not liable for their conduct.

Proceeding further on the hypothesis that one of the special officers shot the plaintiff, and approaching the legal problem from another angle, the query arises whether such conduct was justifiable. Under the circumstances, was it reasonably necessary that force be employed to prevent the culprit's escape? Such question is generally one for jury determination, but, as with other jury questions, there is judicial supervision. No verdict in any case will be permitted to stand which is clearly against the weight of the evidence. Let us appraise the situation.

The officers came upon the plaintiff and his associate committing a felony against both the federal government and the state. With respect to arrests of felons, some of the courts have made distinction between capital felonies and inferior felonies. *State* v. *Bryant,* 65 N. C. 327. But such is not the common law rule. That rule does not classify felonies in the matter of arrests. At common law, an officer may wound, and even kill, a fleeing felon if such course be necessary to effect arrest and prevent escape. 2 Hale's P. C. 77; IV Blackstone, 292; 2 Bishop Crim. Law (9th Ed.), sec. 647; 2 Ruling Case Law, page 471; Vorhees on Arrests (2d Ed.), secs. 152, 193; *Carr* v. *Arkansas,* 43 Ark. 99; *Suell* v. *Derricott,* 161 Ala. 259, 49 So. 895, 23 L. R. A. (N. S.) 996. Extreme measures, of course, are always to be cautiously employed by the officer, as he is not the ultimate authority to judge of the necessity therefor. Unnecessary severity is not sanctioned by the law, and will be penalized. The common law is the law of West Virginia save as changed by constitution or statute. West Virginia Constitution, Article VIII, section 21.

Within reasonable limits, the degree of force to be employed by an arresting officer is a matter in his discretion. 5 Corpus Juris, page 424. In making an arrest, the officer is presumed to have acted in good faith, and when his conduct comes later to be weighed in the coolness of judicial surroundings, and perhaps in a conference of the judges of an appellate tribunal,

the mistake must not be made of evaluating the conduct solely from the viewpoint of the later environment. The appraisal must be made in the light of the pressing circumstances as the officer saw them. *Village of Barboursville ex rel. Bates* v. *Taylor*, 115 W. Va. 4, 174 S. E. 485, 92 A. L. R. 1093; *Davidson* v. *Allam*, 143 Va. 367, 130 S. E. 245.

The plaintiff was a fleeing felon whose identity was unknown to the officers. In the rugged surroundings of a mountain gorge there was no possibility of overtaking him. When he refused their command to halt, should they have permitted him to depart unscathed? Such course not only would have involved the risk of his never being brought to justice, but would have involved personal risk to themselves in the possibility of his ambushing himself on the mountainside and firing upon them. It is a matter of common knowledge that throughout the years men who secrete themselves in the fastnesses of the mountains for the purpose of illicit distillation of spirituous liquors have not been hesitant to take the lives of officers attempting to bring them to justice. Changing sentiment with regard to prohibition does not render moonshining any less a felony at one time than another. In the case of *Stinnet* v. *Commonwealth of Virginia*, 55 F. (2d) 644, the circuit court of appeals made some wholesome observations which are peculiarly pertinent to the situation at hand. The court said: "Courts should not lay down rules which will make it so dangerous for officers to perform their duties that they will shrink and hesitate from action which the proper protection of society demands. The fact that some officers have overstepped their authority and that instances have occurred where officers have needlessly taken human life is no reason why the courts should deny to all officers the protection of the rules which experience has shown to be essential to the proper performance of their duties. When the state sends an officer forth to arrest a felon, she says to him to make the arrest peaceably if he can, forcibly if he must. * * * Opposition to the prohibition laws leads some persons to look upon these laws as in a class to themselves (that was written before the abolition of prohibition); but the courts must enforce the law as it is laid down by the lawmaking

power. When Congress declares that certain crimes shall be punished as felony, the courts must deal with them as such; and, when officers of the law go forth to arrest persons guilty of such crimes, they are dealing with persons who under the law are felons.'' Such, we think, is a succinct statement of the law as it obtains in this jurisdiction. We therefore reach the conclusion that the officers did not act unreasonably in shooting the plaintiff to effect his arrest.

In the light of all that precedes, we reverse the judgment of the trial court, set aside the verdict, and remand the case for further proceedings.

*Judgment reversed; verdict set aside; remanded.*