STATE OF HAWAII, Plaintiff-Appellee, *v.* LEE RACKLE, Defendant-Appellant.

NO. 5501

JUNE 13, 1974

RICHARDSON, C.J., LEVINSON, KOBAYASHI, OGATA and MENOR, JJ.

OPINION OF THE COURT BY MENOR, J.

Defendant Lee Rackle was tried in district court on May 3, 1973, and found guilty of violating HRS § 727-25 (now HRS § 134-51), which prohibits the carrying of a deadly weapon. At the time of his arrest the defendant had in his possession a distress flare, commonly referred to as a "flare gun", which then contained a phosphorus cartridge. The trial court found that this distress flare was "a deadly weapon if used in an offensive manner." In denying the defendant's motion for reconsideration, the court stated that it found the flare gun to be a per se deadly weapon.

HRS § 134-51 (Supp. 1973) reads in relevant part:

Carrying deadly weapons; penalty. Any person not authorized by law, who carries concealed upon his person or within any vehicle used or occupied by him, or who is found armed with any dirk, dagger, blackjack, slug [sic] shot, billy, metal knuckles, pistol, or other deadly or dangerous weapon, shall be fined not more than $250, or imprisoned not more than one year, or both . . . . Any weapon, above enumerated, shall, upon conviction of the one carrying or possessing same under this section, be summarily destroyed by the chief of police or sheriff. (Emphasis added)

The foregoing statute was originally enacted into law with the passage of H.B. No. 24, which became Act 123 of the Session Laws of Hawaii 1937. Prior thereto, charges for carrying deadly or dangerous weapons were brought under the provisions of the vagrancy statute (then section 6310, RL 1935). In recommending passage of the bill, the House Judiciary Committee noted in its report:[1]

Under the present law one who carries a dangerous or deadly weapon can only be charged with "going offensively armed" under the vagrancy chapter (Chapter 214) of the Revised Laws and, as "vagrancy" has been defined by the courts as being "a status and not an act" (which means that the evidence must always show a continuing state of vagrancy or vagabondage), it is almost impossible

---

[1] 1937 HAWAII HOUSE JOURNAL 612.

to successfully charge and convict a person who, in a specific instance, is found armed with dangerous and deadly weapons.

As originally proposed and recommended for passage, the bill would have proscribed the carrying of a "knife with a blade of 2½ inches or more." An amendment was offered[2] and adopted[3] which deleted this phrase from the law as it was finally enacted. This is particularly significant, because by adopting the amendment the Legislature evidenced its intention that not all instruments capable of inflicting death or serious personal injury should come within the purview of the statute.

However, by removing knives from the operation of Act 123, the Legislature did not thereby foreclose prosecution under section 6310 for "going offensively armed" with a knife.[4] What the Legislature did was to indicate clearly that a knife should not be considered a "deadly or dangerous weapon" under HRS § 134-51. It left undisturbed the provisions of the vagrancy statute under which prosecution for carrying deadly weapons had previously been initiated.

Section 6310 of the Revised Laws of Hawaii 1935, provided in pertinent part as follows:

"*[E]very person who is dangerous or disorderly by reason of his being a rioter, disturber of the peace, going offensively armed, uttering menaces or threatening speeches or otherwise, is a vagrant . . . .*" (Emphasis added)

While the provisions of section 6310 were amended from time to time following the enactment of Act 123, the essential language quoted above remained virtually unchanged.[5] The

---

[2] *Id.* at 660.

[3] *Id.* at 746.

[4] In 1972 the Legislature enacted HRS § 134-52 which provides:

"Whoever knowingly manufactures, sells, transfers, possesses, or transports in the State any switchblade knife, being any knife having a blade which opens automatically (1) by hand pressure applied to a button or other device in the handle of the knife, or (2) by operation of inertia, gravity, or both, shall be fined not more than $1,000 or imprisoned not more than one year, or both."

[5] RL 1945, Ch. 287, § 11771; RL 1955, Ch. 314, § 314-1; HRS § 772-1.

entire section was subsequently repealed by Act 9 of the Session Laws of Hawaii 1972. Its repeal, however, did not enlarge the scope of the statute (HRS § 134-51) under which the defendant here has been charged. The 1972 Legislature did enact legislation designed to cover situations where instruments not deadly or dangerous per se may become deadly or dangerous by the nature of their use or attempted use,[6] but the defendant was not prosecuted under any of these laws, nor does the evidence show that he could have been charged and convicted under any of their provisions.

Where words of general description follow the enumeration of certain things, those words are restricted in their meaning to objects of like kind and character with those specified. *In re Deering's Estate*, 29 Haw. 854 (1927). This is the rule of *ejusdem generis* often utilized by the courts in the construction of statutory law. This doctrine is especially applicable to penal statutes, which must be strictly construed. *Coray v. Ariyoshi*, 54 Haw. 254, 506 P.2d 13 (1973); *Haili v. United States*, 260 F.2d 744 (9th Cir. 1958).

In enacting what is now HRS § 134-51 (Supp. 1973) the Legislature sought to proscribe the act of carrying those weapons *specifically enumerated* in the statute, as well as other deadly or dangerous weapons *of like kind and*

---

[6] Hawaii Penal Code. HRS § 707-711 (Supp. 1973) provides:

Sec. 711 — Assault in the second degree.

(1) A person commits the offense of assault in the second degree if:

(a) He intentionally or knowingly causes bodily injury to another person with a dangerous instrument; or

(b) He recklessly causes serious bodily injury to another person with a dangerous instrument.

(2) Assault in the second degree is a class C felony.

Hawaii Penal Code. HRS §§ 707-713 to 714 (Supp. 1973) state:

Sec. 713 — Reckless endangering in the first degree.

(1) A person commits the offense of reckless endangering in the first degree if he employs widely dangerous means in a manner which recklessly places another person in danger of death or serious bodily injury.

(2) Reckless endangering in the first degree is a class C felony.

Sec. 714 — Reckless endangering in the second degree.

(1) A person commits the offense of reckless endangering in the second degree if he engages in conduct which recklessly places another person in danger of death or serious bodily injury.

(2) Reckless endangering in the second degree is a misdemeanor.

*character.*[7] *Brown v. State,* 105 Miss. 367, 62 So. 353 (1913); *State v. Nelson,* 38 La.Ann. 942, 58 Am.R. 202 (1886); *Barboursville ex rel. Bates v. Taylor,* 115 W. Va. 4, 174 S.E. 485 (1934).

In *Brown v. State, supra,* the defendant was charged with carrying a razor under a statute which provided that "any person who carries concealed, in whole or in part, any bowie knife, dirk knife, butcher knife, pistol, brass or metallic knuckles, slungshot, sword or other deadly weapon of like kind and description, shall be guilty of a misdemeanor." His conviction was set aside.

While recognizing that an ordinary instrument or object may become a deadly weapon by virtue of its use, although not specially designed for offensive or defensive purposes, or for the destruction of life or the infliction of injury, the court held that a razor, in and of itself, did not fall into the category of "other deadly weapon of like kind and description" proscribed by the statute.

In *State v. Nelson, supra,* the statute prohibited the "carrying of bowie-knives, pistols, dirks, or any other dangerous weapons." The defendant was charged with having in his possession a razor. On reversing his conviction the court said:

"In our opinion, the meaning of the statute, unmistakably, is the carrying of a weapon *eo nomine* . . . . It must be a dangerous weapon *per se* — such as a bowie-knife, pistol or dirk . . . ." *Id.* at 944, 58 Am.R. at 204.

While conceding that an article such as an iron bolt, rod, or pin may well be a dangerous weapon under a statute which declares that "any person lying in wait, or in perpetration, or attempt to perpetrate [a felony], . . . [who] shall shoot, stab, or thrust any person with a dangerous weapon [shall be punished]," the court reasoned that it did not necessarily follow that the mere possession of these items would consti-

---

[7] In this regard, the following excerpt from Standing Committee Report No. 37 is especially illuminating:

"House Bill No. 24 makes it a specific misdemeanor to be found with, or carrying, dangerous or deadly weapons and anyone so offending may be charged or convicted of such offense *without the necessity of proving that the defendant has been guilty of continuing vagabondage.*" 1937 HAWAII HOUSE JOURNAL 612. (Emphasis added)

tute carrying a dangerous weapon within the meaning of the statute. The court explained:

> "[If it did], then the carrying concealed on or about one's person of any article which might be used as a dangerous weapon in a combat, whether it be an instrument or not — a stone, a bat, a ball, a pocket-knife, a rod, a bolt, or a bar — anything with which injury might be inflicted, would become 'a dangerous weapon'; and any person carrying any one of these articles . . . would become *eo instanti*, liable to prosecution therefor." *Id.* at 945, 58 Am.R. at 205.

In *Barboursville ex rel. Bates v. Taylor, supra,* the statute made it unlawful for "any person, without a state license therefor, to carry about his person a revolver or other pistol, dirk, bowie knife, slung shot, razor, billy, metallic or other dangerous or deadly weapon of like kind and character."

The instrument there in question was a fountain pen tear gas gun, capable of containing a .38 calibre cartridge. The court remanded the case for a determination of whether its normal or adaptive uses were such as were likely to produce serious bodily injury. The court, however, did lay down certain principles for the trial court's guidance. It instructed:

> "The statute against carrying dangerous or deadly weapons is intended to proscribe the carrying about the person of such instruments as are dangerous per se — inherently, instrinsically, characteristically . . . . An article specified in the statute is denominated inherently dangerous, *eo nomine.* An article not specified in the statute, but *planned and made for a weapon,* is dangerous or deadly within the statutory meaning if in its intended or readily adaptable use it is likely to produce death or serious bodily injury. If it be of that nature, it is of like kind and character to the weapons enumerated in the statute." *Id.* at 7-8, 174 S.E. at 486-7. (Emphasis added).

Accordingly, instruments closely akin to a dirk, dagger, black-jack, slug (slung) shot, billy, metal knuckles, or pistol would undoubtedly fall within the statutory proscription of HRS § 134-51 (Supp. 1973). *Accord, People v. Collins,* 6 Ill.App.3d 616, 286 N.E.2d 117 (1972).

The phrase "other deadly or dangerous weapon" in the statute under consideration gives it the necessary flexibility of scope to bring within its ambit instruments closely associated with criminal activity whose sole design and purpose is to inflict bodily injury or death upon another human being. For example, the metal chain was originally designed as a tool to aid man in his labors — to secure his property, to clear his land, to propel his bicycle. In recent times, however, this innocent and useful item has found its way into the weapons arsenal of the juvenile gang. To carry a few feet of chain, anchored to a handle at one end and intended solely as a close combat weapon, could constitute possession of a "deadly or dangerous weapon" under the statute. *See Beeler v. State,* Okl.Cr., 334 P.2d 799 (1959).

On the other hand it would be anomalous to hold that an instrument which is not designed as an offensive weapon is deadly or dangerous within the meaning of HRS § 134-51 (Supp. 1973). An ordinary flare gun is not designed or intended to be used as a weapon. The drafters of the Federal Gun Control Act of 1968, recognized this fact when they defined "destructive devices" expressly to exclude flares:

> The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signalling, pyrotechnic, line-throwing, safety, or similar device . . . or any other device which the Secretary of the Treasury finds is not likely to be used as a weapon. 18 U.S.C. § 921(4) (c) (1970); 26 U.S.C. § 5845(f) (3) (1970).

On the contrary, distress flares are recommended by the United States Coast Guard Auxiliary as safety equipment for certain classes of motorboats. 33 C.F.R. § 5.03 (1974).

A flare gun is an emergency signalling device employed predominantly aboard boats to expedite rescue efforts. It is not a weapon, the carrying of which would be proscribed by the statute under consideration.

Reversed.

*Chris Peterson,* Deputy Public Defender *(Donald Tsukiyama,* Public Defender, of counsel) for defendant-appellant.

538

*Stephen Lau,* Deputy Prosecuting Attorney *(Barry Chung,* Prosecuting Attorney, of counsel) for plaintiff-appellee.