STATE OF HAWAII, Plaintiff-Appellee *v.* HOWARD GILTNER, Defendant-Appellant

NO. 5659

JUNE 19, 1975

RICHARDSON, C.J., KOBAYASHI, OGATA, MENOR, JJ.
and RETIRED JUSTICE LEWIS Assigned by
Reason of Vacancy

OPINION OF THE COURT BY MENOR, J.

The defendant [appellant herein] was found guilty of carrying a deadly weapon in violation of HRS § 134-51 (Supp. 1973). He appeals from the judgment and sentence of the district court, alleging that the trial court erred in denying his motion to suppress the use in evidence of a diving-type knife recovered from his person.

We reverse for the reasons that (1) the knife seized was not a "dagger" or a "deadly or dangerous weapon" within the meaning of the statute, and (2) the search and seizure was constitutionally impermissible.

I

HRS § 134-51 (Supp. 1973) provides in pertinent part as follows:

"Any person . . . who carries concealed upon his person or within any vehicle used or occupied by him, or who is found armed with any dirk, dagger, blackjack, slug shot, billy, metal knuckles, pistol, or other deadly or dangerous weapon, shall be fined not more than $250, or imprisoned not more than one year, or both."

A "dagger" is defined in Webster's Third New International Dictionary to be a short weapon used for stabbing. Examples given are the "dirk," which is a long straight-bladed dagger; the "stiletto," which is a slender dagger with a blade that is thick in proportion to its breadth; the "poniard," which is a dagger with a usually slender triangular or square blade; the "anlace," which is a tapering medieval dagger; and the "misericord," which is a thin-bladed medieval dagger used to give the coup de grace.

The instrument recovered by the police is a "Sea Hunter" model diver's knife, which is standard equipment for many divers engaged in deep-sea diving. It consists of a hard rubber handle with a blade measuring slightly less than 6-1/2 inches in length, one edge being serrated for most of its length and then curving convexly to the point. Since there is no indication from the statute itself or its legislative history that the Legislature intended to enlarge the definition of "dagger" beyond its usual and ordinary meaning, we find that the trial judge erred in concluding that the knife in question was a "dagger" within the meaning of the statute.

Moreover, the legislative history of the Act indicates that knives generally are not covered by this particular statute. *See State v. Rackle,* 55 Haw. 531, 533, 523 P.2d 299, 301 (1974).

In *State v. Rackle, supra,*[1] we had occasion to construe the statute under consideration. In holding that a flare gun

---

[1] In *Rackle,* the defendant was stopped by the police under circumstances that would have warranted a finding that he was carrying the flare gun for the purpose of offense or defense. We held that it was neither a pistol nor a "deadly or dangerous weapon" proscribed by the carrying statute.

was not a "deadly or dangerous weapon," we explained that what the statute proscribed was the act of carrying any of the weapons enumerated, and those closely akin to those named, as well as instruments associated with criminal activity whose sole design is to inflict death or bodily injury. The fact that an object originally designed for normal or lawful use can be perverted to a use dangerous to one attacked does not convert it into a "deadly or dangerous weapon" within the meaning of statute. The instrument proscribed is one which was designed primarily as a weapon, or one which has been diverted from its normal use and prepared and modified for combat purposes. The diver's knife described above is not a "deadly or dangerous weapon" within the meaning of the statute.

## II

The case before us also involves a situation where two police officers on patrol, at approximately 10:30 p.m., on Seaside Avenue in the Waikiki area, were stopped by an elderly woman who complained that there was a group of men on the second floor landing of a building she had just passed who were making a lot of noise and cursing at people down on the sidewalk. She pointed in the general direction of an apartment building which the officers assumed to be the building at 351 Seaside Avenue. She appeared to be irritated and disturbed by it all, but after speaking to the police, she continued on her way. She had not pointed to any particular group of individuals, but when the police arrived at 351 Seaside Avenue, they saw the defendant and two other male companions on the second floor landing at one end of the building. There was nothing unusual about their conduct. There was none of the yelling and shouting which had been the basis for the woman's complaint. There is no evidence that these were the same individuals referred to by the woman, nor did the police themselves know whether or not they were. Officer Pritchett, however, testified:

"Upon approaching them, I recognized Mr. Giltner [the defendant] from a previous occasion, and knowing him on

that occasion to have been an [*sic*] offensively armed, I felt that it was for my own safety and the best interest of those people around to conduct a pat down of him. I placed Mr. Giltner in a position where his hands were on the railing on that second floor lanai and began to pat him down immediately.''

A field interrogation of the defendant and his companions would have been proper. It would have been appropriate for the officers to make reasonable inquiries regarding the alleged disturbance, so long as the freedom of those with whom they were dealing was not restrained. *State v. Tsukiyama,* 56 Haw. 8, 525 P.2d 1099 (1974). But in placing his hands upon the defendant, Officer Pritchett exceeded the bounds of his authority. This was a seizure of the defendant's person and, under the circumstances, was constitutionally impermissible. The accompanying frisk was accordingly without lawful justification. *Sibron v. New York,* 392 U.S. 40 (1968). *See also Terry v. Ohio,* 392 U.S. 1 (1968).

In *Sibron,* the United States Supreme Court established one of the basic parameters of the stop and frisk doctrine:

"The police officer is not entitled to seize and search every person whom he sees on the street or of whom he makes inquiries. Before he places a hand on the person of a citizen in search of anything, he must have constitutionally adequate, reasonable grounds for doing so. In the case of the self-protective search for weapons, he must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous. 392 U.S. at 64.

There was nothing unusual or suspicious about the conduct of the defendant and his companions in this case. Nor was there anything in the surrounding circumstances which could have justified the seizure of the defendant. The officer could not point to specific and articulable facts from which he could have reasonably inferred that the defendant had committed, or was about to commit an offense. It was not enough that on a previous occasion, personally known to the officer, the defendant had been offensively armed. While this might have been an important factor in determining the legality of

the frisk itself, it could not supply the justification for the initial seizure. The reputation of an individual for carrying arms is not, in and of itself, a sufficient basis for a stop and frisk. *See State v. Joao,* 56 Haw. 216, 533 P.2d 270 (1975); *State v. Joao,* 55 Haw. 601, 525 P.2d 580 (1974); *State v. Onishi,* 53 Haw. 593, 499 P.2d 657 (1972).

Reversed.

*Catherine E. Agor,* Deputy Public Defender *(Donald K. Tsukiyama,* Public Defender, with her on the briefs) for defendant-appellant.

*Reina A. Grant* and *Clesson W. Chikasuye,* Deputy Prosecuting Attorneys *(Barry Chung,* Prosecuting Attorney, with them on the brief) for plaintiff-appellee.