STATE OF HAWAII, Plaintiff-Appellee, Cross-Appellant, *v.* HAROLD C. MEDEIROS, Defendant-Appellant, Cross-Appellee

NO. 8503

(CRIMINAL NO. 53493)

MAY 26, 1983

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY HEEN, J.

Defendant Harold C. Medeiros (Medeiros) appeals from his conviction of manslaughter, Hawaii Revised Statutes (HRS) § 707-702 (1976).[1] The State cross-appeals from the sentence imposed on Medeiros. Medeiros contends the lower court erred in admitting his inculpatory statements into evidence. The State asserts that the court erred in not imposing a

---

[1] HRS § 707-702 provides:

Manslaughter. (1) A person commits the offense of manslaughter if:
(a) He recklessly causes the death of another person; or
(b) He intentionally causes another person to commit suicide.
(2) In a prosecution for murder it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the view-point of a person in the defendant's situation under the circumstances as he believed them to be.
(3) Manslaughter is a class B felony.

mandatory sentence in accordance with HRS § 706-660.1 (1976). We affirm Medeiros' conviction, but vacate the sentence imposed and remand to the court below for resentencing.

On the night of June 13, 1979, as he was driving an automobile meeting the description and bearing the license number broadcast over the police radio, Medeiros was stopped by the police. The broadcast arose from a shooting that had occurred at the Wonder Bar on the corner of Pauahi and Smith Streets in Honolulu. When Medeiros asked why he was being stopped, Police Officer Trela (Trela) answered that there had been a shooting and that Medeiros' automobile matched the description of one identified as leaving the scene. Trela asked Medeiros where he was coming from and Medeiros replied the Wonder Bar. (First Statement) Medeiros had not been advised of his constitutional rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

Medeiros was arrested and driven to the police station. After being "booked," he was taken to the Pawaa Annex in the custody of Officers Silva (Silva) and Miyashiro (Miyashiro) for treatment of a laceration over his left eye. Prior to and during the treatment, Medeiros made several inculpatory statements to Silva and Miyashiro over a period of several minutes. (Collectively referred to as the Second Statement) Medeiros was not then being interrogated and was not responding to any questions or statements from Silva or Miyashiro. After making each statement, Medeiros was warned by the officers not to say anything further but was not given any *Miranda* rights warnings.

On June 14, 1979, another officer obtained another inculpatory statement from Medeiros after giving him the proper warnings. (Third Statement)

On October 17, 1979, the Oahu Grand Jury indicted Medeiros on two counts: 1) the murder of Thompson Myers, HRS § 707-701 (1976), and 2) being a felon in possession of a firearm, HRS § 134-7(b) (1976, as amended). A motion to sever the counts was granted by the trial court and on July 27, 1981 a jury-waived trial was commenced on the murder count.[2]

---

[2] The record does not reveal whether Medeiros was ever tried on the firearm count.

Medeiros moved, at various stages of the trial, to suppress all of the above statements. The court granted the motions to suppress the first and third statements,[3] but refused to suppress the second statement. On July 29, 1981, at a bench trial, the court found Medeiros guilty of the lesser-included offense of manslaughter.

On August 12, 1981, the State filed a motion for a mandatory term of imprisonment pursuant to HRS § 706-660.1 (1976) and a motion for an extended term of imprisonment pursuant to HRS § 706-661 (1976) and § 706-662(1) (1976, as amended). On November 5, 1981, the court orally granted the State's motion for an extended term of imprisonment and denied the motion for mandatory term of imprisonment. Medeiros was sentenced to twenty years of incarceration. These appeals followed.

## I. MEDEIROS' APPEAL

Medeiros contends that the Second Statement was the "fruit of the poisonous tree"[4] of the prior inadmissible statement given to Officer Trela and was, therefore, inadmissible. We disagree.

---

[3] Suppression of the third statement was not on the basis of the "fruit of the poisonous tree" doctrine, but because it was not voluntarily made.

[4] The "fruit of the poisonous tree" doctrine, a derivative of the exclusionary rule, had its genesis in issues concerning illegally obtained physical evidence and prohibits the use of evidence at trial which comes to light as a result of the exploitation of a previous illegal act of the police. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S. Ct. 182, 64 L.Ed. 319 (1920). However, not all evidence obtained as a result of the initial illegality is forever unavailable or inadmissible. Admissibility is determined by ascertaining whether the evidence objected to as being the "fruit" was discovered or became known by the exploitation of the prior illegality or by other means sufficiently distinguishable as to purge the later evidence of the initial taint. *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed.2d 441 (1963). Where the government proves that the evidence was discovered through information from an independent source or where the connection between the illegal acts and the discovery of the evidence is so attenuated that the taint has been dissipated, the evidence is not a "fruit" and, therefore, is admissible. *Wong Sun v. United States, supra*.

As applied to confessions, the "fruit of the poisonous tree" doctrine holds that where one confession or admission is illegally obtained and subsequently the defendant makes a further confession, the second confession is inadmissible in evidence as a "fruit of the poisonous tree" if it results from an exploitation of the prior illegality.[5] *Killough v. United States,* 315 F.2d 241 (D.C. Cir. 1962).

However, a confession made subsequent to an inadmissible one is not automatically inadmissible. Where a confession has been illegally obtained, the government will not be allowed to introduce into evidence a subsequent confession unless it first demonstrates that the latter was not obtained by exploiting the initial illegality or that any connection between the two had become so attenuated that the taint was dissipated. *United States v. Gresham,* 585 F.2d 103 (5th Cir. 1978); *United States v. Matthews,* 488 F. Supp. 374 (D. Neb. 1980); *Sanders v. Rowe,* 460 F. Supp. 1128 (N.D. Ill. 1978). Moreover, in *Westover v. United States,* 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court stated that illegal custodial interrogations would not automatically make inadmissible a subsequent in-custody statement where the defendant has been given an appropriate warning of his rights prior to the second statement.

In determining whether a second confession has become tainted by the prior illegally obtained confession, other courts have established criteria to assist them. Among the criteria

---

[5] The dilemma of the accused who has made a second confession after an inadmissible one, known as the "cat out of the bag" doctrine, was addressed by the United States Supreme Court in *United States v. Bayer,* 331 U.S. 532, 67 S. Ct. 1394, 91 L.Ed. 1654 (1947). There the Court stated:

Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a useable one after those conditions have been removed.

*Id.* 331 U.S. at 540-541, 67 S. Ct. at 1398, 91 L.Ed. at 1660.

most often considered are the time and place of the subsequent confession, the manner of interrogation, whether there was representation by counsel, the defendant's mental condition, conduct of the police, whether the defendant has had an opportunity to speak with family and friends, whether the defendant is in a position where he believes that his first confession has made his present position hopeless, and whether the subsequent confessions were a product of interrogation or voluntarily made. *Westover v. United States, supra; United States v. Bayer, supra; United States v. Gresham, supra; Knott v. Howard,* 511 F.2d 1060 (1st Cir. 1975); *Matter of R.P.S.,* ___ Mont. ___, 623 P.2d 964 (1981); *State v. Allies,* 37 St. Rep. 2089, 621 P.2d 1080 (1980); *State v. Paz,* 31 Or. App. 851, 572 P.2d 1036 (1977).

A review of the instant record in light of those standards indicates that the Second Statement was clearly not the product of interrogation and was spontaneous and voluntary. Notwithstanding the fact that the Second Statement was made only a short time after the first, it was not obtained by any exploitation of the First Statement, was not a "fruit of the poisonous tree," and was, therefore, properly admitted into evidence.

Medeiros also contends that the Second Statement should have been excluded because the State failed to show that it was made voluntarily. We have already found that Medeiros' Second Statement was unsolicited, spontaneous, and voluntary, and not the product of interrogation. The statement, even when made without a waiver of constitutional rights, was not barred by federal or state constitutional provisions and was properly admitted by the trial court. *State v. Lincoln,* 3 Haw. App. 107, 643 P.2d 807 (1982). There is no merit to Medeiros' contention.

## II. STATE'S APPEAL

The State contends on its cross-appeal that the trial court erred in denying its motion for a mandatory term of imprisonment. The trial court, in denying the motion, impliedly ruled that the flare gun used in the homicide was not a "firearm." The

State asserts that the court's interpretation of the word "firearm" used in the statute was too restrictive.

Hawaii Revised Statutes § 706-660.1 states in pertinent part:

> (b) A person convicted of a second firearm felony offense as provided in section (a), herein, where the person had a firearm in his possession and threatened its use or used the firearm while engaged in the commission of the felony, shall be sentenced to a mandatory term of imprisonment the length of which shall be as follows:
>
> (1) For a class A felony — 10 years; and
>
> (2) For a class B felony — 10 years.
>
> The sentence of imprisonment for a second felony offense involving the use of a firearm as provided in this subsection shall be exempted from the procedure for determining minimum term of imprisonment prescribed under section 706-669, provided further that a person who is imprisoned in a correctional institution as provided in this subsection shall become subject to the parole procedure as prescribed in section 706-670 only upon the expiration of the term of mandatory imprisonment fixed under (b)(1) or (2), herein.
>
> As used in this subsection, "firearm" has the meaning defined in section 134-1.

"Firearm" is defined by § 134-1, HRS (1976, as amended), as:

> any weapon, the operating force of which is an explosive. This definition includes pistols, revolvers, rifles, shotguns, machine guns, automatic rifles, noxious gas projectors, mortars, bombs, cannon, and submachine guns. The specific mention of certain weapons does not exclude from the definition other weapons operated by explosives.

Were it not for the case of *State v. Rackle,* 55 Haw. 531, 523 P.2d 299 (1974), we would not hesitate to hold that the flare gun used by Medeiros is a pistol. HRS § 134-1. Its nomenclature is "Pistol, Very, 10 Gage, M5."[6] It has the same shape as a

---

[6] A Very pistol is a special pistol used for firing Very lights which are white or colored pyrotechnic signals employed in a system of signaling. It is named after its inventor, Edward W. Very.

pistol, with a handle in the shape of a pistol butt, a two-inch long barrel from which a phosphorous flare is normally shot, and a single action trigger that operates a hammer and firing pin. It "breaks" open at the breech for loading.

In *Rackle* the defendant was carrying a flare gun when he was arrested by the police and charged with carrying a deadly weapon in violation of HRS § 134-51.[7] On defendant's appeal from a guilty verdict, the supreme court held that a flare gun was not a deadly or dangerous weapon, the carrying of which was proscribed under the statute, because it was not designed as an offensive weapon. Although HRS § 134-51 prohibits the carrying of a pistol, the supreme court did not address the question whether the flare gun met that definition. We are compelled, however, to read *Rackle* as impliedly holding that a flare gun is not a pistol since, if it were, there would have been a violation of HRS § 134-51. As an inferior court, we are bound to follow the decision of the supreme court. *Robinson v. Ariyoshi,* 65 Haw. ___, 658 P.2d 287 (1982); *In re Allen,* 35 Haw. 501 (1940); *In re Austin,* 33 Haw. 832 (1936).

However, *Rackle* does not preclude us from holding that the manner in which the flare gun was used in this case makes it a weapon and, therefore, a firearm within the meaning of HRS § 134-1 and the sentencing provisions of HRS § 706-660.1.

The question here is whether the flare gun 1) is a weapon that 2) operates by means of an explosive force.

We have no problem answering yes to the second question. The evidence showed that the victim was shot in the head by pellets from a shotgun shell inserted in the breech of the flare

---

[7] HRS § 134-51 (1976) provides:

Carrying deadly weapons; penalty. Any person not authorized by law, who carries concealed upon his person or within any vehicle used or occupied by him, or who is found armed with any dirk, dagger, blackjack, slug shot, billy, metal knuckles, pistol, or other deadly or dangerous weapon, shall be fined not more than $250, or imprisoned not more than one year, or both. Any such person may be immediately arrested without warrant by any sheriff, policeman, or other officer or person. Any weapon, above enumerated, shall, upon conviction of the one carrying or possessing same under this section, be summarily destroyed by the chief of police or sheriff.

gun and fired by Medeiros when he pulled the trigger. *See People v. Evergood,* 74 N.Y.S.2d 12 (1947).

The first question, however, is somewhat more difficult. Our statutes contain no definition of weapon, and a review of the relevant cases also fails to uncover any such definition. While *Rackle,* and its progeny[8] dealt with "deadly or dangerous weapon," we are concerned only with the more general term, "weapon."

A weapon is defined by Webster's Third New International Dictionary (1967) as:

an instrument of offensive or defensive combat : something to fight with : something (as a club, sword, gun, or grenade) *used in destroying,* defeating, or physically injuring an enemy ... WEAPON applies to *anything used* or *usable* in injuring, destroying, or defeating an enemy or opponent. [Emphasis added.]

Black's Law Dictionary (5th ed. 1979) defines it as:

[a]n instrument of offensive or defensive combat, or *anything used,* or *designed to be used,* in destroying, defeating or injuring a person. The term is chiefly used, in law, in the statutes prohibiting the carrying of "concealed" or "deadly" weapons. See also Dangerous weapon; Deadly weapon; Offensive weapon. [Emphasis added.]

Clearly a weapon may be: 1) an instrument that is designed for offensive or defensive use, or 2) an instrument that is used as a weapon, though not designed as such or for such use. *Commonwealth v. Sampson,* 383 Mass. ___, 422 N.E.2d 450 (1981); *Williams v. City Court of Tucson,* 21 Ariz. App. 318, 519 P.2d 71 (1974); *cf. State v. Giltner,* 56 Haw. 374, 537 P.2d 14 (1975); *State v. Rackle, supra.* Instruments that are weapons by design are all instruments which are normally associated with criminal activities and which are designed solely or primarily to inflict death or bodily injury. Such instruments are considered *per se* deadly weapons. *State v. Giltner, supra; State v. Rackle, supra; Commonwealth v. Sampson, supra.*

---

[8] *See also State v. Muliufi,* 64 Haw. 485, 643 P.2d 546 (1982); *State v. Jones,* 61 Haw. 135, 597 P.2d 210 (1979); *State v. Rodrigues,* 56 Haw. 642, 547 P.2d 587 (1976); *State v. Giltner,* 56 Haw. 374, 537 P.2d 14 (1975).

Instruments that are not weapons by design may nonetheless become weapons in the broad sense by the manner in which they are used.[9] *Commonwealth v. Sampson, supra; People v. Evergood, supra. Cf. State v. Giltner, supra; State v. Rackle, supra. See, e.g., State v. Calhoun,* 72 Iowa 432, 34 N.W. 194 (1887) (cord may be considered weapon if used to kill or disable victim); *Williamson v. State,* 92 Fla. 980, 111 So. 124 (1926) (automobile may be weapon though it is not designed or constructed as such).

A flare gun is not intended or designed to be a weapon, *State v. Rackle, supra; Commonwealth v. Sampson, supra; People v. Evergood, supra,* nor is it commonly understood to be one. *Mars Equipment Corp. v. United States,* 437 F. Supp. 97 (N.D. Ill. 1977). It is designed to enable boat operators and others to send a visual distress signal. *State v. Rackle, supra; Commonwealth v. Sampson, supra.* Clearly, the flare gun has a legitimate, non-combative design and purpose, and is not *per se* a "deadly or dangerous weapon." *State v. Rackle, supra.*

---

[9] To analogize, the Hawaii Penal Code has defined a dangerous instrument in two ways for different purposes. For purposes of assault, HRS § 707-700(4) (1976, as amended) defines "dangerous instrument" as;

any firearm, or other weapon, device, instrument, material, or substance, whether animate or inanimate, which *in the manner it is used* or is *intended to be used* is known to be capable of producing death or serious bodily injury[.] [Emphasis added.]

In dealing with robbery, HRS § 708-840 (1976) states:

As used in this section, "dangerous instrument" means any firearm, or other weapon, device, instrument, material, or substance, whether animate or inanimate, *which in the manner it is used* or *threatened to be used* is capable of producing death or serious bodily injury. [Emphasis added.]

Thus, under the penal code, an instrument is considered "dangerous" where its use or intended/threatened use is capable of producing death or serious bodily injury notwithstanding the instrument's normal lawful purpose. Just as an ordinary instrument may become a deadly instrument, an ordinary instrument may also become a weapon, depending on its use.

As the court in *Rackle* noted:

The 1972 Legislature did enact legislation designed to cover situations where instruments not deadly or dangerous per se may become deadly or dangerous by the nature of their use or attempted use, but the defendant was not prosecuted under any of these laws, nor does the evidence show that he could have been charged and convicted under any of their provisions. [Footnote omitted.]

*State v. Rackle,* 55 Haw. at 534, 523 P.2d at 301. *See also State v. Muliufi, supra.*

However, merely because its design is innocent does not prevent a flare gun from becoming a weapon if it is used in an offensive or defensive manner. *People v. Evergood, supra.*

In the instant case, Medeiros took a flare gun, placed a 12-gauge shotgun shell in the breech, discharged the shell into the skull of the decedent, and killed him. Medeiros clearly used the flare gun as an instrument of offensive combat to "injure, defeat, and destroy his enemy." The flare gun was in fact used as a weapon in this case.[10] It was, therefore, a weapon and a firearm within the meaning of HRS § 134-1.[11]

Medeiros had indeed suffered his second conviction for an offense in which he used a firearm and the court erred in denying the State's motion for mandatory term.

---

[10] In *United States v. Coston,* 469 F.2d 1153 (4th Cir. 1972), the court assumed that a flare gun was a weapon and the only question was then whether it was a firearm.

[11] We realize that our holding raises questions with respect to whether the other provisions of HRS, Chapter 134, relating to registration (134-2), permits to acquire (134-3), place to keep firearms (134-6), possession by a felon (134-7), permits to carry (134-9), licenses to sell and manufacture firearms (134-31), and carrying deadly weapons (134-51) apply generally to flare guns. We do not so hold for the reason that those provisions apply to firearms which are weapons *per se* and not to instruments such as flare guns which become weapons only by the manner in which they are used. We are in agreement with the Supreme Judicial Court of Massachusetts which, when faced with a situation where the defendant was charged with carrying a flare gun without a firearm license, stated:

> The question before us then becomes: Should a device that is neither designed nor actually used as a weapon be deemed a weapon that must be licensed because its owner intends to use it as a weapon at some time in the future? We think not. In a licensing scheme that depends on obtaining legal permits in advance, the definition of the object subject to licensing should be construed, as much as is feasible, in a manner that does not require looking into the subjective intent of the potential licensee.

*Commonwealth v. Sampson, supra,* at 453.

However, where a person possesses a flare gun which is not registered and he has inserted in the breech a shotgun shell or other similar ammunition and uses or attempts to use it in an offensive or defensive manner, he may be charged with possession of an unregistered firearm.

Medeiros' conviction is affirmed. The sentence imposed on Medeiros is vacated and the matter is remanded for resentencing in accordance with this opinion.[12]

*Karl K. Sakamoto,* Deputy Public Defender, (*Michael K. Tanigawa,* Deputy Public Defender, and *Geronimo Valdriz, Jr.,* law clerk, on the briefs) for defendant-appellant, cross-appellee.

*Nancy T. Sugimura,* Deputy Prosecuting Attorney, City & County of Honolulu, (*Arthur E. Ross,* Deputy Prosecuting Attorney, on the opening brief) for plaintiff-appellee, cross-appellant.

CONCURRING AND DISSENTING OPINION OF TANAKA, J.

I concur with Part I of the majority opinion. However, I cannot agree with the majority's construction of Hawaii Revised Statutes (HRS) § 134-1 (1976 & Supp. 1982) and, therefore, respectfully dissent as to Part II.

Hawaii Revised Statutes § 706-660.1(b) (1976) requires a mandatory term of imprisonment upon conviction of a second firearm felony offense. HRS § 706-660.1 provides that "'firearm' has the meaning defined in section 134-1." HRS § 134-1 defines "firearm" as "any weapon, the operating force of which is an explosive," but includes no definition of the word "weapon."

In construing the word "weapon" in HRS § 134-1, the majority holds that it means and includes both "an instrument that is designed for offensive or defensive use," and "an instrument that is used as a weapon, though not designed as such or for such use." The majority states that "[a] flare gun is not intended or designed to be a weapon, . . . nor is it commonly understood to be one." The majority then concludes that since the "flare gun was in fact used as a weapon in this case," it was "a weapon and a firearm within the meaning of HRS § 134-1."

---

[12] Inasmuch as the sentence to be imposed on remand is mandatory, we do not deem it necessary to have another judge impose the new sentence. *Cf. State v. Anderson,* 4 Haw. App. 102, 661 P.2d 716 (1983).

Initially, I agree with the majority that *State v. Rackle,* 55 Haw. 531, 523 P.2d 299 (1974), is not dispositive of this case. *Rackle* involved the construction of the words "deadly or dangerous weapon" in HRS § 134-51. *Rackle* held that a flare gun is not a "deadly or dangerous weapon" within the meaning of HRS § 134-51. The general term "weapon" in HRS § 134-1 was not involved and construed in *Rackle.*

Hawaii Revised Statutes chapter 134 generally deals with the regulation of firearms, ammunition and dangerous weapons. HRS § 134-1 is the definition section for the entire chapter. In fact, HRS § 134-1 expressly states, "*As used in this chapter:* 'Firearm' means any weapon, the operating force of which is an explosive." (Emphasis added.) Consequently, what is construed to be a "firearm" in HRS § 134-1 will perforce be applicable to the ensuing sections dealing with the registration, permits and licenses required to bring into the State, acquire, possess, sell and manufacture "firearms."

I am not convinced that HRS chapter 134 was enacted to regulate "an instrument that is used as a weapon, though not designed as such or for such use." Whether an owner or possessor of an instrument which is not designed or intended to be used as a weapon intends to use such instrument as a weapon in the future should be irrelevant in a regulatory or licensing statute. I agree with the Supreme Judicial Court of Massachusetts that:

> In a licensing scheme that depends on obtaining legal permits in advance, the definition of the object subject to licensing should be construed, as much as feasible, in a manner that does not require looking into the subjective intent of the potential licensee.

*Commonwealth v. Sampson,* 383 Mass. ___, ___, 422 N.E.2d 450, 453 (1981). I would construe the term "firearm" in HRS § 134-1 to mean a weapon which is only an instrument designed for offensive or defensive use, the operating force of which is an explosive.

Under the majority's holding, the flare gun possessed by defendant Medeiros is a firearm under HRS § 134-1 because he *used* the flare gun as a weapon. The logical implication of the holding is that under HRS § 134-1, "firearm" includes any instrument which may be used as a weapon if its owner or

possessor intends to so use it. Under such a holding, even firecrackers will be "weapons" when used offensively against another person and since they 1) are "weapons" that 2) operate "by means of an explosive force," they are also "firearms" subject to regulation under HRS chapter 134. Yet, the majority states that the registration, permit and license provisions of HRS chapter 134 apply only to "firearms which are weapons *per se* and not to instruments such as flare guns which become weapons only by the manner in which they are used." *See* footnote 11 of majority opinion. If that is the case, we have an anomalous situation of a definition under the general definition section (HRS § 134-1) not being applicable to the ensuing regulatory sections.

I would affirm the sentence imposed by the trial judge.